448 P.2d 209

**BEN LOMOND, INC., Plaintiff-Appellant,**

**v.**

**The CITY OF IDAHO FALLS, a Municipal corporation; Eddie Pedersen, as Mayor, and Jack A. Wood, Marilyn Smith, Melvin Erickson, Jim R. Freeman, Gordon L. Nelson and Dale D. Parish, as councilmen for the City of Idaho Falls, and Ray Browning, as Building Official of the City of Idaho Falls, Defendants-Respondents.**

**No. 10094.**

Supreme Court of Idaho.

Dec. 6, 1968.

Petersen, Moss & Olsen, Idaho Falls, for appellant.

Albaugh, Bloem, Smith & Pike, Idaho Falls, for respondents.

McFADDEN, Justice.

Appellant, Ben Lomond, Inc., the plaintiff below, instituted this action initially for a writ of mandamus to compel the defendant City of Idaho Falls to issue a building permit for construction of a service station on its property. Appellant's property, the subject of this action, is a tract 110′ x 125′ with an adjoining easement. The tract fronts on what is now 17th Street of the City of Idaho Falls, and is a part of a larger tract initially owned by appellant. By amended pleadings appellant later sought declaratory relief against the City to determine the constitutionality of certain city ordinances, and for injunctive relief to compel issuance of building permit for either a service station or a drive-in restaurant on its premises.

Very briefly, the facts disclosed by the record reflect that Norman Thompson, initially in February 1960 acquired an option on a ten acre tract of Bonneville County, adjacent to the city limits of Idaho Falls. (This tract was later annexed by the City on October 18, 1962 and is known as the

Roy H. Bennett Shopping Center.) Thompson requested that the county zoning commission and county commissioners approve a proposed shopping center plan for this property. This plan envisioned the use of this litigated property as a service station. The county approved the plan and zoned the tract as a residential shopping center, although it refused to issue a building permit for the station. Because of pressing financial problems created by refusal of his financial backer to continue with the plan, Thompson transferred his interest in the option to appellant, of which Thompson is the president. Appellant sold the northwest part of the tract to McCarthy Investment Company, and a service station was constructed thereon. Later appellant sold the remainder of the tract except for a parcel 150′ x 660′ at the east of the ten acre tract to another individual; still later, appellant sold to Mr. Woodward all of the 150′ x 660′ except for the one tract of 110′ x 125′ now owned by it and the subject of this litigation.

Appellant assisted Woodward in presentation to the county of a development plan envisioning construction of a grocery store on this property, which if constructed, would have made it possible for appellant to transfer its 110′ x 125′ tract to a bank interested in building thereon, provided the grocery store was constructed. As a condition to granting the grocery store building permit, the city and county insisted on dedication of a 30′ "planting easement" along 17th Street on appellant's property. This was granted and building permit issued to Woodward, but the permit was later canceled, and this proposal proceeded no further.

Between October 18, 1962, the date of annexation to the City, and August 22, 1963, when the city adopted Ordinance 1063, all of this property was unzoned insofar as the City was concerned. In February 1963 an option holder on this tract applied for a building permit for a drive-in restaurant. After inaction on the application for 60 days, the option was allowed to lapse.

Following this, an oil company entered into an agreement to purchase the property, and tried to obtain a building permit on the property for a service station. This company also was refused a permit and that agreement fell through. Still another oil company entered into another agreement to purchase, conditioned on obtaining a building permit to construct a service station, and this too was unsuccessful, the mayor stating that he would issue no permit because of commitments to residents across the street. This latter oil company then agreed to lease the property at a monthly rental with gallonage allowance, provided appellant could obtain a building permit for a service station.

On August 1, 1963, appellant sought a building permit and right to cross the planting easement. No official action was taken by the City. The building inspector, a city employee, testified that the City was holding up all building permits until a new zoning ordinance was enacted, and that he had told the "building official," the witness's superior, there was no basis for holding up the permits. The building inspector was then given specific instructions to issue no permits on this property until it was zoned.

No action was taken on appellant's August 1, 1963 application for permit until the council meeting of August 22, 1963. At this meeting, the council, after suspending the rules (I.C. § 50–2004) passed Ordinance 1063, amending a prior zoning ordinance. The council then considered and approved, over appellant's objections, a comprehensive plan for development of the shopping center, which plan left appellant's land vacant. The council then denied appellant's application for a building permit, without explanation, other than that it was done "upon advice of counsel."

Appellant commenced this action in September 1963, seeking the issuance of a building permit for a service station. Prior to trial, appellant twice requested the City to amend the approved comprehensive plan to provide for construction of the service

station with additional exit for egress over the planting easement. These requests were denied, first under Ordinance 1063, and then later under Ordinance 1115, a new zoning ordinance adopted in August 1964, superseding Ordinance 1063.

In November 1963, appellant, in an attempt to settle the litigation, petitioned the City for a permit to build a drive-in restaurant on its land, without seeking any further access over the planting strip. This petition was denied.

Following trial of the case, the trial court held that under the provisions of the City's zoning ordinance, a service station could be constructed on appellant's land only if it is an integrated part of the adjoining shopping center, and since appellant's proposal required an access over the planting easement to the street, it was not an integrated part of the shopping center. The court also held that, under the zoning ordinance, a "drive-in" restaurant was not a permitted use within the residential shopping center zone. The trial court found that appellant had been afforded due process of law during all the hearings and that the ordinances are valid exercises of the police power and are not unconstitutional.

Both Ordinances 1063 and 1115 of the City of Idaho Falls are zoning ordinances, the former amending a previous zoning ordinance, and the latter being a comprehensive ordinance. Both establish what is classified as a "Residential Shopping Center Zone," for areas of not less than two nor more than twenty acres. Before any area can be zoned under that classification, a development plan is to be submitted to and approved by the planning commission and city council. Permitted uses in the zone under Ordinance 1115 include a variety of retail establishments, office buildings, banks, "Restaurants, cafes, tearooms * * service stations," and "other uses similar to the foregoing * * *." The record does not contain a copy of the Bonneville County zoning ordinance or regulations.

■ The property was annexed to the City on October 18, 1962. At that time the City had no applicable zoning ordinance, and only upon adoption of Ordinance 1063 on August 22, 1963, was there an applicable zoning ordinance enacted. In the meantime, numerous requests were made to the City by prospective lessees or purchasers from appellant for a building permit on the property, all of which were denied. Appellant's land was unzoned insofar as the City was concerned when its application for building permit and curb cut of August 1, 1963 was presented. The majority rule that land formerly within the county's jurisdiction, upon annexation comes into the city as unzoned land is succinctly stated in 101 C.J.S. Zoning § 134, p. 892:

> "The zoning status of property annexed to a municipality depends on the provisions of the municipal ordinances, and in the absence of any provision covering the matter it has been held that unincorporated territory, on being annexed to a city, occupies the status of unzoned property regardless of its zoning status before annexation. County zoning regulations cease to apply to territory which has become part of a city." (101 C.J.S. Zoning § 134, p. 892)

Louisville & Jefferson County Planning & Zoning Commission v. Fortner, 243 S.W. 2d 492 (Ky.App.1951); City of South San Francisco v. Berry, 120 Cal.App.2d 252, 260 P.2d 1045 (1953); Ellish v. Village of Suffern, 30 A.D.2d 554, 291 N.Y.S.2d 178 (1968); Farley v. DeMuth, 399 S.W.2d 469 (Ky.App.1965). Annot. 41 A.L.R.2d 1463. Contra, Highland Village Land Co. v. City of Jackson, 243 Miss. 34, 137 So.2d 549 (1962).

■ Although none of the authority cited is binding on this court, it is our opinion that those cases holding that county zoning ordinances cease to apply to land annexed to a city state the better rule. Mississippi seems to be the only jurisdiction following the contrary rule. The Mississippi Supreme Court in Highland Village Land Co. v. City of Jackson, 243 Miss. 34, 137 So.2d 549 (1962), held that the county zoning ordinance must continue to govern

the annexed land in order to protect the expectations of those persons who purchased their land before the annexation. We believe this is an insufficient reason to justify a continued application of the county law. The cases supporting the majority rule, on the other hand, rest upon the proposition that local subdivisions of government are separate sovereignties and that the ordinances of one political subdivision are of no effect in another. The Idaho Constitution specifically recognizes that such is the case:

"Any county or incorporated city or town may make and enforce, *within its limits,* all such local police, sanitary and other regulations as are not in conflict with its charter or with the general laws." (Idaho Const. Art. 12, § 2) (Emphasis added.)

Similarly, the Idaho decisions have consistently held that county ordinances are not effective within the boundaries of a municipality. In Hess Distributing Co. v. Bonneville County, 69 Idaho 505, 210 P.2d 798 (1949), this court, after quoting from Article 12, § 2 of the Idaho Constitution, stated:

"It appears to be conceded that in the exercise of the powers granted by such constitutional provision, a county cannot make police regulations effective within a municipality. * * * It also appears to be conceded that county regulations passed under such constitutional grant of power, cannot be enforced in a municipality in a field reserved to municipalities under the constitution, whether such field has been occupied by municipal ordinance or not. * * * Therefore, the fact that it does not appear that the regulation in question is in conflict with any existing ordinance of a municipality, is not important. The question is one of power and not one of conflict." (at 510–511, at 801 of 210 P.2d)

To the same effect are State v. Robbins, 59 Idaho 279, 81 P.2d 1078 (1938); Justice Taylor's special concurring opinion in Barth v. De Coursey, 69 Idaho 469, 207 P. 2d 1165 (1949); Ex Parte Roach, 104 Cal. 272, 37 P. 1044 (Cal.1894) and Ex Parte Knight, 55 Cal.App. 511, 203 P. 777 (Cal. App.1921). The language of Ex Parte Knight is particularly pertinent here:

"Since, therefore, a municipality is a distinct governmental entity, entirely independent of the county as such, and is, consequently, subject to no local legislation which is within the power of the governing board of the county to enact, it is wholly immaterial whether or not the municipal authorities exercise or put into operative effect all the powers conferred upon it by its charter and the Constitution. The county, in brief, has no legal right to legislate for a municipality located within its limits upon any subject which is within the scope of the powers granted to the municipality, and particularly upon any matters involving the police power of the state." (at 779)

In the present case, then, the county zoning ordinance ceased to apply once the land in question was removed from the county's jurisdiction by annexation. The land was from that time subject to the city's jurisdiction, and the city having failed to take any action to provide a zoning classification for that land, the conclusion is inescapable that the land was unzoned. The city undoubtedly could have adopted the county ordinance or enacted its own zoning ordinance immediately upon annexation. In fact, I.C. § 50–1206, enacted after the present controversy had arisen (S.L. 1967, Ch. 429 § 214), specifically provides that a city shall begin zoning proceedings before land is formally annexed and shall zone such land immediately upon annexation. The fact that this statute was enacted in 1967 tends to indicate that the legislature considered land annexed to a city to be unzoned land prior to action being taken by the city. If in fact the county zoning ordinance continued to apply to the land, there would be no need for a statute such as I.C. § 50–1206. Given the

existence of this statute, the present difficulty should not arise again. In the present case, however, it is our opinion that under Article 12, § 2 of the Idaho Constitution the county zoning ordinance could no longer apply to the land in question once it was annexed to the City of Idaho Falls.

■ A service station, not being a nuisance per se, is a permissible use on unzoned land. Yokley, citing several cases, states that "A gasoline filling station is not a nuisance per se, and when properly constructed and operated is a lawful business. The right to operate a filling station is said to be a right inherent in property ownership in the absence of valid zoning regulations or restrictive covenants." (2 Yokley, Zoning Law and Practice, § 229, Pocket Part p. 97 (3rd ed. 1965) ). White v. City of Twin Falls, 81 Idaho 176, 338 P.2d 778 (1959) ; Continental Oil Co. v. City of Twin Falls, 49 Idaho 89, 286 P. 353 (1930) ; Sikes v. Pierce, 212 Ga. 567, 94 S.E.2d 427 (1956) ; Town of Homecroft v. MacBeth, 238 Ind. 57, 148 N.E.2d 563 (1958). Under such circumstances the City had no authority to deny appellant's requested permit after appellant had tendered the required fees and complied with all requirements in existence at the time of filing its application, as reflected by the record. It is our conclusion that the provisions of Ordinance 1063, enacted subsequent to filing of appellant's application for permit to build and for access, was inapplicable to appellant's application. (See I.C. § 50–1206, enacted S.L.1967, Ch. 429, § 214, pertaining to this problem in future annexations.)

The City contends, however, that it is the ordinance in existence at the time of ruling on the application for a permit which governs and that under Ordinances 1063 and 1115 appellant was not entitled to construct a service station which would utilize egress across the planting strip easement. Although some courts have held that a change in the law following an application for a building permit will be applied to the prior application (Burmore Co. v. Champion, 124 N.J.L. 548, 550, 12 A.2d 713 (1940) ; Baxley v. City of Frederick, 133 Okl. 84, 271 P. 257 (1928) ; McEachern v. Town of Highland Park, 124 Tex 36, 73 S.W.2d 487 (1934) ; Franchise Realty Interstate Corporation v. City of Detroit, 368 Mich. 276, 118 N.W.2d 258 (1962) ; Annot: 169 A.L.R. 584; 8 McQuillin Municipal Corporations, § 25.155, p. 492 (1965)), this rule has not usually been applied when a city has unreasonably refused or delayed in passing upon an application until after the new ordinance has become effective, or when the issuing officer has arbitrarily failed to perform a ministerial duty to issue a permit when the applicant was presently entitled to it. State ex rel. Humble Oil & Refining Co. v. Wahner, 25 Wis.2d 1, 130 N.W.2d 304 (1964) ; Sgromolo v. City of Asbury Park, 134 N.J.L. 195, 46 A.2d 661 (1946) ; Phillips Petroleum Co. v. City of Park Ridge, 16 Ill.App.2d 555, 149 N.E.2d 344 (1958) ; State ex rel. Ogden v. City of Bellevue, 45 Wash.2d 492, 275 P.2d 899 (1954) ; Annot: 169 A.L.R. 584; 8 McQuillin, Municipal Corporations § 25.155, pp. 495–496 (1965). In the instant case, the district court held that a delay by the City of ten months in zoning the land in question was not unreasonable. Be that as it may, it is our conclusion that appellant was entitled to a building permit for the service station and the egress requested when it filed its application and the land being unzoned, issuance of the permit was merely a ministerial duty of the city building official. In such situation, the later enactment of the ordinance cannot be held to divest appellant of this right.

■ No Idaho cases deal with this point. The weight of (and in our opinion the better reasoned) authority from other jurisdictions however, is to the effect that a public official must issue a building permit when the applicant has complied with all existing requirements. In State ex rel. Ogden v. City of Bellevue, 45 Wash.2d 492, 275 P.2d 899 (1954), the city attempted to rezone the plaintiff's land after the plaintiff had applied for a building permit to

·construct a parking lot. In granting a writ of mandamus the court stated:

"A building or use permit must issue as a matter of right upon compliance with the ordinance * * *. An owner of property has a vested right to put it to a permissible use as provided for by prevailing zoning ordinances. The right accrues at the time an application for a building permit is made * * *. The moves and countermoves of the parties hereto by way of passing ordinance (sic) and bringing actions for injunctions, should and did avail the parties nothing. A zoning ordinance is not retroactive so as to affect rights that have already vested * * *. The appellant's right vested when he made application for his permit, and the respondents were required to issue the permit upon his compliance with the standards of the ordinance." (at 901–902)

Similarly in Sgromolo v. City of Asbury Park, 134 N.J.L. 195, 46 A.2d 661 (1946) the plaintiff applied for a permit to build a restaurant on his unzoned land. His permit was denied and later a zoning ordinance was enacted prohibiting restaurants on the plaintiff's land. In holding that the ordinance did not apply, the New Jersey Supreme Court stated:

"As we have seen, the zoning ordinance has no application. For here there was a full compliance with the building code before the zoning ordinance was adopted. It was therefore the peremptory duty of the building inspector to issue the permit in question." (at 662)

To the same effect are Phillips Petroleum Co. v. City of Park Ridge, 16 Ill.App.2d 555, 149 N.E.2d 344 (1958); State ex rel. Romero v. Viator, 217 La. 239, 46 So.2d 256 (1950); State ex rel. Humble Oil & Refining Co. v. Wahner, 25 Wis.2d 1, 130 N.W. 2d 304 (1964); City of Decatur v. Fountain, 214 Ga. 225, 104 S.E.2d 117 (1958). See also I Yokley, Zoning Law and Practice, § 9.7, p. 418 (3rd Ed. 1965).

■ Respondent relies on Felice v. City of Inglewood, 84 Cal.App.2d 263, 190 P.2d 317 (1948), as supporting the contrary view that the pendency of a change in a zoning ordinance may adversely affect rights to a building permit. Recognizing that there are cases supporting the respondent's position, the better reasoned authority is otherwise; also, such authority is in accord with the general rule that legislation generally acts prospectively only. Winans v. Swisher, 68 Idaho 364, 195 P.2d 357 (1948); Wanke v. Ziebarth Const. Co., 69 Idaho 64, 202 P.2d 384 (1949); Application of Boyer, 73 Idaho 152, 248 P.2d 540 (1952); Ford v. City of Caldwell, 79 Idaho 499, 321 P.2d 589 (1958); Application of Forde L. Johnson Oil Co., 84 Idaho 288, 372 P.2d 135 (1962).

■ The cases supporting respondent's position generally hold that a change in a zoning ordinance, or the enactment of a zoning ordinance governing previously unzoned land, will be applied to an application for a permit unless a permit has already been granted and substantial expenditures have been incurred in reliance on it. Baxley v. City of Frederick, 133 Okl. 84, 271 P. 257 (1928); McEachern v. Town of Highland Park, 124 Tex. 36, 73 S.W.2d 487 (1934); Franchise Realty Interstate Corporation v. City of Detroit, 368 Mich. 276, 118 N.W.2d 258 (1962); Russian Hill Improvement Ass'n v. Board of Permit Appeals of City and County of San Francisco, 66 Cal.2d 34, 56 Cal.Rptr. 672, 423 P.2d 824 (1967); Poczatek v. Zoning Board of Appeals of Town of Huntington, 26 A.D.2d 556, 270 N.Y.S.2d 980 (1966). We reject the reasoning of this line of authority. At least in those cases like the present one, in which no zoning ordinance was pending at the time an application for a building permit is filed, it is our opinion that an applicant is entitled to a building permit upon compliance with the then existing ordinance. The record in the present case clearly indicates that the City for several months failed to approve any of the various requests for building permits on the land, even though no contention was made that the requests failed to comply with existing

legal requirements. No zoning ordinance was pending before the council at the time. The importance of such a point is borne out by the fact that in several cases supporting the defendant's position, the ordinance which was applied retroactively was already pending when the application was filed. Russian Hill Improvement Ass'n v. Board of Permit Appeals of City and County of San Francisco, 66 Cal.2d 34, 56 Cal.Rptr. 672, 423 P.2d 824 (1967); Socony-Vacuum Oil Co. v. Mount Holly Township, 135 N.J.L. 112, 51 A.2d 19, 169 A.L.R. 579 (1947); A. J. Aberman, Inc. v. City of New Kensington, 377 Pa. 520, 105 A.2d 586 (1954); Shender v. Zoning Board of Adjustment, 388 Pa. 265, 131 A.2d 90 (1957). Such is not the case here. Furthermore, to hold for the City in the present case would mean that a city, merely by withholding action on an application for a permit, could change or enact a zoning law to defeat the application. It could, in substance, give immediate effect to a future or proposed zoning ordinance before that ordinance was enacted by proper procedure. The present case effectively illustrates this possibility. The language of the Wisconsin Supreme Court in holding that a city could not deny an application for a building permit on the basis of an ordinance later enacted is pertinent here:

"* * * it is apparent that the town officials were trying to keep one jump ahead of Humble and were attempting to change the rules after they had been hailed into court for what Humble believed was arbitrary, unreasonable, and capricious action. * * * If the town's contention is upheld it would be tantamount to approving the proposition that every time a party came close to successfully challenging a town and its zoning board on its zoning actions, his gains could be legislated away by the enactment of an amendment to the ordinance." State ex rel. Humble Oil & Refining Co. v. Wahner, 25 Wis.2d 1, at 14, 130 N.W. 2d 304, at 311 (1964).

Respondent also argues that appellant had requested Bonneville County to zone the land in question as a residential shopping center and should not now be heard to complain when the City placed the land in the same zone. Under the facts of the present case, however, this argument carries little weight. The record clearly shows that the comprehensive plan submitted by appellant when it requested a residential shopping center zone showed a service station on its land with the requested access ways.

Respondent in its brief, and in oral argument, conceded that the law in effect at the time of filing an application for a building permit controls when the applicant has a presently existing right to the permit and the issuing office has only a ministerial duty to issue it. Respondent, however, contends that such is not the case here because appellant had no right to a curb cut and access across the planting strip dedicated to the public, and hence had no presently existing right to a building permit. It is our opinion, however, that respondent is incorrect in its contention.

 The Idaho decisions have established that the right of access from one's land to a public way is a property right appurtenant to the owner's land. White v. City of Twin Falls, 81 Idaho 176, 338 P.2d 778 (1959); Farris v. City of Twin Falls, 81 Idaho 583, 347 P.2d 996 (1959); Hughes v. State, 80.Idaho 286, 328 P.2d 397 (1958); Hadfield v. State ex rel. Burns, 86 Idaho 561, 388 P.2d 1018 (1964). A zoning ordinance cannot deprive a person of this property right without some police power justification. The leading case is Village of Sandpoint v. Doyle, 14 Idaho 749, 95 P. 945 (1908), in which the village sought to prohibit access from appellant's property to a public bridge. In holding that access to the bridge could be reasonably regulated, but not prohibited, this court said:

"* * * every property owner having a lot abutting on a street or thoroughfare has a special and peculiar right in that particular street not common to the other citizens. That right is a property right appurtenant to his lot, * * *. If he

cannot get out from his property and has no means of ingress or egress, then the streets and thoroughfares of the municipality will be of no use to him, and consequently his property will be of little benefit to him. While the public generally may have no special or particular interest in the right of ingress to any particular lot owner's property, the lot owner has a very material and special interest in having the public reach his property and place of business, and in his right to go and come and carry on business and invite the public to his place of business. It has been held by the courts that to cut off this right of ingress and egress would be to take the lot owner's property without due process of law." (at 757, 95 P. at 947)

■ More directly in point is Continental Oil Co. v. City of Twin Falls, 49 Idaho 89, 286 P. 353 (1930), in which a city ordinance prohibiting the erection of a service station near a school, if the access to the station crossed a public sidewalk, was held invalid. This court there held, quoting from Village of Sandpoint v. Doyle, that an ordinance cannot unreasonably restrict a person's right of access to a public way unless the ordinance is justified by the city's police power. In the present case, as in Continental Oil, there are no reasonable grounds for denying the requested access. The testimony of Officer Lewis Nielson, an acknowledged traffic expert, establishes that an additional direct access from the requested service station to 17th Street would not create a traffic hazard. In fact, he testified that it would add to the safety of the area by relieving congestion at the adjoining entrance and exit to the shopping center. Moreover, appellant introduced into evidence photographs illustrating that other service stations and businesses along 17th Street, in the near vicinity of appellant's land, had several curb cuts giving direct access to 17th Street. Photographs of other service stations with more than one curb cut along West Broadway in Idaho Falls were also offered in evidence, but

they were rejected for lack of a proper foundation. It is our opinion that appellant showed sufficient similarity between the area of West Broadway and 17th Street that the photographs should have been admitted for the purpose of showing that the denial of an access in the present case could not be justified on the grounds of safety. Herzog v. City of Pocatello, 83 Idaho 365, 363 P.2d 188 (1961).

The City offered no evidence of any special considerations justifying the denial of the additional direct access to the service station located on appellant's land, while allowing almost unlimited curb cuts for other service stations and businesses along 17th Street. This court has held that to allow commercial activity along one side of a street while denying it along the other side, in the absence of some police power justification, constitutes unlawful discrimination. White v. City of Twin Falls, 81 Idaho 176, 338 P.2d 778 (1959).

■ On the basis of appellant's evidence and the testimony of Officer Nielson, it is apparent that the City's refusal to grant an access from appellant's land to 17th Street is not justified by considerations of the health, safety, morals or welfare of the City's inhabitants. The fact that appellant's application requested an access across the planting easement was not a sufficient reason to refuse to issue the permit, and appellant, having complied with all existing requirements at the time of filing its application, was at that time entitled to the building permit it requested. Under such circumstances the later enactment of Ordinances 1063 and 1115 did not divest appellant of its right to the permit.

■ It is to be pointed out, however, that the result would be the same even if Ordinances 1063 and 1115 applied to appellant's application. It is conceded that a service station is a permitted use under either of these ordinances if it utilizes only the access to the shopping center. The only question is whether the additional access requested by appellant would also

be permitted. It is our conclusion that there is nothing in either ordinance inconsistent with appellant's request for a direct access to 17th Street. Indeed, Ordinance 1063 specifically provides that service stations are permitted within as RSC (Residential Shopping Center) zone:

"when access thereto is limited to access from the interior of the shopping center without curb cuts additional to the curb cuts provided for the shopping center area *or where the service station is located in compliance with all set back requirements for the shopping center buildings. * * *.*" (Emphasis added.)

The only purpose in using the word "or" in such a statement is to provide two clearly alternative conditions under which a service station can be constructed. It seems clear that when the set back requirements are met, there are no restrictions on curb cuts.

Under Ordinance 1115, adopted in August 1964, which superseded Ordinance 1063, there is only one restriction on curb cuts, and it is clearly inapplicable in the present case. That portion of Ordinance 1115 pertaining to residential shopping centers provides that "No driveway shall be located closer than one hundred fifty (150) feet to the point of intersection of the front property line with the side property line which abuts upon a street * * *." Nothing in the Ordinance limits the *number* of accesses or curb cuts for a service station erected on appellant's land. The district court, however, reasoned that service stations are permitted in a residential shopping center only if they are an integrated part of the shopping center and that a separate access across the planting easement would set the service station apart, thus removing it as an integral part of the zone. The district court was in error in this regard.

Nothing in the record indicates that a direct access to 17th Street would remove the requested service station from the shopping center. On the contrary, there is a great deal of testimony to the effect that a drive-in business is the only type of business which would be economically feasible on appellant's land. Officer Nielson also testified that a separate exit for the service station would relieve congestion at the entrance to the shopping center itself, thus facilitating traffic movement and safety.

It is our conclusion then, that regardless of whether or not the ordinances apply to appellant's request for a building permit, it should have been granted. Under the facts of this case the ordinances do not apply, but in any event they do not purport to limit the number of accesses to appellant's land.

In regard to appellant's request of November 9, 1965 for a permit for the construction of a drive-in restaurant on its land, it is our opinion that the district court was correct in ruling that Ordinance 1115 prohibits drive-in restaurants in an RSC–1 zone. This ordinance clearly applies to the request for a restaurant permit because the request was not made until November 9, 1965, which was long after the ordinance had been enacted. Appellant argues, however, that the ordinance does not exclude drive-in restaurants from an RSC–1 zone, and that if interpreted otherwise the ordinance would be arbitrary, discriminatory, and unconstitutional.

Among the uses permitted by Ordinance 1115 in an RSC–1 zone are "Restaurants, cafes, tearooms" and "Other uses similar to the foregoing * * *." Appellant argues that drive-in restaurants are sufficiently similar to restaurants as to come within the language of Ordinance 1115. Drive-in restaurants, however, are specifically dealt with in another ordinance and are limited to Highway Commercial Zones (HC–1). The Idaho Falls City Council considered that there was sufficient difference between drive-in restaurants and other restaurants to justify placing the two types of businesses in different zones. (See Ordinance No. 1063, which stated under permitted uses in RSC zone "Restaurant service, including liquor service at tables only, without bar, no curb or drive-in service.") It can hardly be said, then, that the City

contemplated allowing drive-in restaurants in an RSC–1 zone by using the phrase "Other uses similar to the foregoing * * *" in Ordinance 1115. Since the Council intended to exclude drive-in restaurants from an RSC–1 zone, the only question remaining is whether the distinction drawn between restaurants and drive-in restaurants is reasonable.

Appellant relies heavily on Frost v. Village of Glen Ellyn, 30 Ill.2d 241, 195 N.E.2d 616 (1964), to sustain its contention that an ordinance permitting restaurants in a particular zone but excluding drive-in restaurants from the same zone is arbitrary and unreasonable and therefore void. The Frost case is very similar to the case at bar, even insofar as drive-in restaurants were specifically zoned to a different zone. The Illinois Supreme Court held the zoning ordinance invalid, stating:

> "We fail to see how a drive-in restaurant of the nature here planned is significantly more detrimental to the public health, safety, welfare or morals than a restaurant fully enclosed within four walls, or than a bakery, a candy or ice cream store, a grocery store, a meat market, a delicatessen, or a retail liquor store and many more of the sixty-two businesses permitted in B–2 districts." (at 619)

Similarly in State ex rel. Spiccia v. Abate, 2 Ohio St.2d 129, 207 N.E.2d 234 (1965), the plaintiff's land was zoned for use as a restaurant. Drive-in restaurants were specifically zoned to another area. Nevertheless the Ohio Supreme Court held that zoning ordinances, being in derogation of the common law, must be liberally construed and therefore held that the term "restaurant" as used in the ordinance included a drive-in restaurant. To the same effect is Burke v. O'Connor, 53 Misc.2d 669, 279 N.Y.S.2d 633 (1967).

Although the foregoing cases support appellant's contention, it is our opinion that there are significant differences between restaurants and drive-in restaurants. The two types of restaurants may be sufficiently similar that drive-ins will be allowed wherever restaurants are allowed, absent a special ordinance dealing with drive-ins. See: Fryer v. Board of Zoning Adjustment of Kansas City, 359 Mo. 559, 222 S.W.2d 761 (1949); Food Corp. v. Zoning Board of Adjustment of City of Philadelphia, 384 Pa. 288, 121 A.2d 94 (1956); Earle v. Zoning Board of Review of City of Warwick, 191 A.2d 161 (R.I.1963). We cannot say, however, that a legislative decision to assign different zoning classifications to the two businesses is so arbitrary or unreasonable as to render Ordinance 1115 unconstitutional. Officer Nielson testified that drive-in restaurants create a great volume of traffic. It was also Officer Nielson's opinion that of the several accidents occurring at the shopping center at First and Holmes (one of the streets adjacent to appellant's land) a drive-in restaurant was a major factor in causing the accidents. And it should be noted that drive-in restaurants create problems of littering and noise not usually associated with regular restaurants. Given these distinctions between the two types of business, the City of Idaho Falls, acting under its police power, could justifiably confine each business to a different zone.

The judgment of the trial court is reversed and the cause remanded with directions to enter conclusions of law and judgment in conformity with this opinion.

Costs to appellant.

SMITH, C. J., and TAYLOR and SPEAR, JJ., concur.

McQUADE, Justice (dissenting).

The city of Idaho Falls on October 18, 1962, annexed ten acres of land adjacent to its southern city limits. Prior to this date, the ten acres had been zoned for a residential shopping center by Bonneville County. This had been done pursuant to the grant of power given the county by I.C. § 31–3801 "for the purposes of promoting health, safety, morals and general welfare, to provide for orderly development

of land and to protect property values." The county approved a shopping center plan which was proposed by the president of appellant corporation while he still held individually an option upon this ten acres. The plan included a service station proposed for the 110′ x 125′ lot on the northeast corner of the ten acre tract, but the county refused to issue a building permit for the station. The use of this 110′ x 125′ lot, now owned by appellant corporation, is the subject of this litigation.

After this ten acre tract was annexed to the city, but about three weeks before it had been zoned by the city, appellant requested a building permit for a gasoline station on its land so it might lease the land to an oil company. This request was the only one made by appellant. For this purpose appellant also requested permission to cross with a driveway to the gasoline station a thirty foot wide planting easement along Seventeenth Street. The city delayed issuing a building permit because it first wished to pass an ordinance zoning the annexed land. The city passed ordinance 1063 on August 22, 1963, ten months after it had annexed the land. The district court found that this delay was not unreasonable, and the majority appears not to question that conclusion. This ordinance again zoned the land for a residential shopping center, and at the same meeting the city adopted a comprehensive shopping center plan. Because appellant's proposed gasoline station was not adapted for this plan, its application for a permit was denied. Appellant therefore brought suit to compel the issuance of a permit, which suit was unsuccessful in the district court.

The majority opinion is based on the conclusion that appellant's land was unzoned. The majority concludes that, since the annexed land was unzoned when appel-

lant applied for its permit to build a gasoline station, it was the city's "ministerial duty" to issue the permit. This conclusion postulates that the annexed ten acres came into the city as unzoned land, and the larger number of the few cases dealing with this point do appear to support this view. However, the Kentucky cases [1] rely upon a comprehensive statutory scheme (K.R.S. §§ 100.031 to 100.098) which establishes a combination city-county planning and zoning commission whose recommendations require separate approval by the county and city (K.R.S. §§ 100.048, 100.049). This planning organization emphasizes the separate entities of city and county. Land annexed to the city from the county can be zoned in accordance with the commission's proposals only with the express consent of the city, and until such action is taken the annexed land remains unzoned. The California [2] and New York [3] cases rely solely upon California Const. art. XI, § 11, and N.Y. Town Law § 132 (McKinney's Consol.Laws, c. 62, 1965), respectively, which provide simply that ordinances will be effective only within the territorial limits of the municipality or county involved.

On the other hand, the Supreme Court of Mississippi has expressly refused to follow such authority. In Highland Village Land Company v. City of Jackson,[4] plaintiff's land was zoned mostly for residential purposes by the county. When the city annexed this land, plaintiff requested that the residential portion be rezoned for commercial purposes. The city council refused to do so, and plaintiff brought suit, urging that

"the action of the city is void because when the city limits were extended and the property taken into the city the zoning ordinances adopted by the county board of supervisors terminated insofar

1. Louisville and Jefferson County Planning and Zoning Commission v. Fortner, 243 S.W.2d 492 (Ky.App.1951); Farley v. DeMuth, 399 S.W.2d 469 (Ky.App. 1965).

2. City of South San Francisco v. Berry, 120 Cal.App.2d 252, 260 P.2d 1045 (1953).

3. Ellish v. Village of Suffern, 30 A.D. 2d 554, 291 N.Y.S.2d 178 (1968).

4. 243 Miss. 34, 137 So.2d 549 (1962).

as said property was concerned and such property was unzoned so that the city, until it had taken the necessary legal steps, had no jurisdiction over zoning of this particular property." [5]

The Court stated, however, that it was unwilling and unable to accept as law the proposition that when property which had been zoned by the county was taken into the city it came as unzoned property." [6] The Court in order to protect residential property values in the area, to vindicate reliance upon existing ordinances until they were duly changed, and to carry out the beneficial purposes of zoning, held that the city was authorized to take the action it did. In effect, the Court refused to permit a lapse in zoning control like that said to be present in this case.

To prevent such lapses in the future, I.C. § 50–1206 now provides that cities must determine the proper zoning of annexed areas "concurrently with or immediately following the ordinance of annexation * * *." It would be eminently sensible for this Court to effectuate the same purpose in this case, which happened to arise before the enactment of I.C. § 50–1206. It is unfortunate that appellant, by utilizing the lapse in this case, is allowed to acquire the gasoline station which was denied under the county ordinance which the city attempted to deny under its ordinance. Moreover, such a result is contrary to the implications of certain of our own cases. In Boise City v. Better Homes [7] and in Gaige v. City of Boise,[8] owners of certain parcels of land which were annexed to the city were given the benefit of whatever status the county had assigned to their land before annexation. In both cases, this Court prevented the city from automatically applying its ordinances to deprive the owners of uses acquired when the land was situated in the county. In this case the owner of

county land was refused a certain use under the county ordinances and hence acquired no vested interests under the county ordinances. Appellant should not be permitted that use merely because the land is annexed by a new legal sub-division which temporarily has no ordinance to cover the land. To do so is to allow owners of annexed land to reject the burdens of county ordinances while enforcing their benefits. For certain porposes, city and county are separate legal sub-divisions, but for zoning and planning purposes the county zoning ordinances should furnish a basis for the city's refusal to issue building permits for newly-annexed land until the city affirmatively enacts its own ordinances.

There are other bases for the city's refusal to issue a permit in this case. It may be noticed that when an area is about to be zoned, individual entrepreneurs may desire to build structures and acquire vested interests on the land, which might later be prohibited. There is a rush to acquire non-conforming uses:

> "As a consequence, property owners in the area being zoned frequently hasten to acquire building permits under the existing ordinance, if there be one * * *. This practice has been characterized by the courts as a 'race for diligence' and has been stated to be neither in the best interests of the community nor individual property owners." [9]

Unless there is some means of temporarily retaining the status quo in such land, this race will always be won by the individual landowner to the detriment of the general public. This is true because the enactment of zoning ordinances normally requires a great deal of time for study, planning and administrative consideration.

The aggregate result of these races for diligence can be tragic. Planning author-

---

5. Id. at 42, 551.

6. Id.

7. 72 Idaho 441, 243 P.2d 303 (1952).

8. 91 Idaho 481, 425 P.2d 52 (1967).

9. Comment, Stop-Gap and Interim Legislation, A Device to Maintain the Status Quo of an Area Pending the Adoption of a Comprehensive Zoning Ordinance or Amendment Thereto, 18 Syracuse L.Rev. 837 at 838–839 (1967).

ities who advocate the formation of nucleus-type commercial centers for low-density fringe areas like the area in this case point out that

"[I]n practice, however, the most noticeable commercial development in these areas is 'strip commercial' * * *. It comprises everything from billboards to drive-in movies, from gas stations to motels, from diners to trucking terminals, from farm fruit stands (and even working farmland) to discount department stores, from junkyards to dime-and-dance." [10]

The authors point out that compact centers such as they have favored must be developed at one time by one entrepreneur acquiring a large tract of land under his centralized control. "A strip, by contrast, grows by gradual accretion, in tune with * * * the pattern of individual land ownership." [11] It is also stated that there are remedies for the situation, including "* * * a growing trend to give more zoning power to counties, especially a veto power over zoning changes along county and state roads." [12]

More specifically in relation to shopping centers, it is recognized that "the intent of zoning is to bring a semblance of order into dynamic but anarchistically expanding areas and to guide their growth along more desirable lines:" [13]

"[In contrast to strip zoning] the modern shopping center which integrates commercial, business, entertainment and cultural facilities within a carefully planned framework, which separates various modes of traffic from each other, and which provides for the protection of surrounding residential areas from any objectionable performances, has made a significant contribution in this direction." [14]

It is stated that one of the most important objectives of a shopping center planner is to convince all interested parties that the center "will, by careful planning, achieve harmonious integration with the neighborhood." [15]

The record in the present case indicates that the city of Idaho Falls was attempting to achieve just such objectives. To accomplish these objectives, municipalities have sought means to retain the status quo of unzoned areas so that uses inconsistent with the ordinance as ultimately adopted do not develop in an uncontrolled fashion. Most often the means chosen is a stop-gap or emergency zoning ordinance. [16] Administrative delay also may be a means to this end, [17] and that was the means chosen by the city in this case. The majority would require that an ordinance actually be pending before the municipality at the time it denies building permits, but even the cases said to support this rule are not unqualified. [18] This conclusion fails to take ac-

---

10. Tunnard and Pushkarev, Man-Made America: Chaos or Control? 322 (New Haven and London: Yale Univ. Press 1963); See also Blake, God's Own Junkyard: The Planned Deterioration of America's Landscape 109–118 (chapter entitled "Roadscape") (Holt, Rinehart and Winston: New York, Chicago, San Francisco 1964).

11. Id. at 324.

12. Id.

13. Gruen and Smith, Shopping Towns USA: The Planning of Shopping Centers 46 (New York: Reinhold Pub. Corp. 1960).

14. Id. at 48.

15. Id. at 49.

16. See Rhyne, Municipal Law §§ 32–3, 32–4 (1957); McQuillin, Municipal Corporations § 25.64 (rev. ed. 1965).

17. Comment, Stop-Gap and Interim Legislation [Etc.], supra, n. 9, at pp. 848–849.

18. Russian Hill Imp. Ass'n v. Board of Permit Appeals of City and County of San Francisco, 66 Cal.2d 34, 56 Cal. Rptr. 672, 423 P.2d 824, 832–833 (1967) (under an ordinance making permit final when "lawfully granted" as substitute for judicial doctrine of substantial beginning of construction); Socony-Vacuum Oil Co. v. Mt. Holly Township, 135 N.J.L. 112, 51 A.2d 19 (1947) (zoning commission

count of the time needed for careful study and planning of projected zoning, during which time anxious entrepreneurs may decimate an expanding area with "Strip Commercial." It would encourage precipitous action by municipalities in its increasingly important responsibilities as a land-use planner. Moreover, it places too heavy an emphasis upon the individual economic rights of an entrepreneur as opposed to the rights of the general public. It is certainly true that loose procedures in zoning law may lead to serious abuses.[19] But it is also becoming apparent that the "individualistic bias for our legal system" can have adverse effects upon community planning,[20] although theoretically the public interest in zoning is preferred over private interest in property.[21] "Courts are more and more being called on to decide issues which are increasingly technical and complex * * * yet courts are ill-equipped to make decisions on technical matters, and it is far from clear that the adversary system provides the best approach to [this kind of] decision making."[22]

On the basis of these considerations, I find more persuasive those authorities which temper their protection of individual economic rights with a substantial measure of respect for municipalities exercising legislative functions in zoning matters. In Cohen v. Incorporated Village of Valley Stream,[23] plaintiff entered a lease with an oil company for the use of a corner lot as gasoline station premises, conditional upon plaintiff's acquisition of a special use permit from the village. Plaintiff made ap-

plication at a time when he would have been entitled to the permit, but a month later the village amended the ordinance to prohibit further gasoline stations in the area where plaintiff's land was situated. The village board had thus deliberately held up its decision upon plaintiff's application until the amendment could be accomplished, but the court held this exercise of power was not arbitrary, discriminatory or confiscatory:

> "The right of a municipality to determine zoning for itself is a legislative power, which may not be interfered with by a court unless it is clearly arbitrary, unreasonable, discriminatory or confiscatory. A village may adopt plans suitable to its own particular location and needs, and these are purely for legislative discretion."[24]

In Gramatan Hills Manor, Inc. v. Manganiello,[25] the facts disclosed "the existence of a question which has plagued courts time and again in zoning cases—the respective rights of the applicant for a building permit, and a municipality, when official action on his application is delayed until a new ordinance outlawing the use has become effective." Plaintiff made application for a permit to build an apartment house at a time when it would have been entitled to a permit but when the Village of Tuckahoe had engaged consultants to prepare a master plan. After plaintiff filed various plans on which consideration was delayed, the village adopted an ordinance prohibiting the issuance of new building permits until the master plan was adopted. It later re-

---

"working" on an ordinance); A. J. Aberman, Inc. v. City of New Kensington, 377 Pa. 520, 105 A.2d 586 (1954) (zoning commission submitted final report and proposed ordinance); Chicago Title and Trust Co. v. Village of Palatine, 22 Ill.App.2d 264, 160 N.E.2d 697 (1959) (public hearings on new ordinance being held, but normal rule is that permit is not final until substantial change of position occurs).

19. See e. g., Comment, Judicial Control Over Zoning Boards of Appeal: Suggestions for Reform, 12 U.C.L.A. L.Rev. 937 (1965).

20. See e. g., Mandelker, The Role of Law in The Planning Process, 30 Law and Contemporary Problems 26 (1965).

21. McQuillin, Municipal Corporations § 25.41.

22. Eldredge, Taming Megalopolis Vol. II 753 (Essay by Reps. "Requiem For Zoning") (New York: Doubleday 1967).

23. 23 Misc.2d 1017, 189 N.Y.S.2d 110 (1959).

24. Id. at 116.

25. 30 Misc.2d 117, 213 N.Y.S.2d 617 (1961).

zoned plaintiff's land to the exclusion of apartment houses. The court held, nevertheless, that as plaintiff had not acquired any vested rights by beginning construction or physically using the land for the contemplated structure, it could not compel the issuance of a permit.[26]

Once it is conceded that the enactment of municipal zoning ordinances is a legislative function subsuming the plenary power to alter zoning ordinances as the public need arises,[27] it should follow that the municipality also has the power either to enact emergency ordinances to preserve the character of the land until comprehensive ordinances can be enacted[28] or to delay the issuance of new permits under the old or non-existent ordinances so long as that delay is neither unreasonably long nor unrelated to the city's efforts to plan the use of the land. Otherwise the primary police power of the municipality to zone land would be substantially undermined. Underlying the decisions in these cases is the sound recognition that the hardship to one property owner caused by the refusal of a permit when he has made no substantial change in his economic position is much less costly to society generally than the relatively permanent hardship caused by the existence of non-conforming land uses.

As applied to the present case, these principles indicate that it was within the legislative power of the city of Idaho Falls to withhold a building permit for a gasoline station on appellant's land. The city could refuse to issue permits for a reasonable time and for the purpose of halting uncontrolled development on newly-annexed and unzoned land whose use for an integrated shopping center the city was then planning. It must be concluded that the city did not have a ministerial duty to issue a permit but on the contrary had a duty to the general public to withhold it so the land use could be rationally planned for the welfare of the entire community. Without such a permit, appellant was properly prevented from changing his economic position by beginning construction on a gasoline station. Therefore it acquired no substantial vested rights which would require this Court to interfere with the city planning of Idaho Falls.

Before turning to the issues raised by the application of ordinances 1063 and 1115 to appellant's land; the precise character and extent of appellant's legal demand in this case should be delineated. Appellant's property fronts on Seventeenth Street.

26. Accord, Felice v. City of Inglewood, 84 Cal.App.2d 263, 190 P.2d 317, 320 (1948); (application for permit vests no rights, and council may refuse permit even if the use is a permitted one); Baxley v. City of Frederick, 133 Okl. 84, 271 P. 257, 259 (1928) (zoning ordinance not invalid as retroactive because made applicable to property for which a permit has been requested); McEachern v. Town of Highland Park, 124 Tex. 36, 73 S.W. 2d 487 (1934); Franchise Realty Interstate Corp. v. City of Detroit, 368 Mich. 276, 118 N.W.2d 258 (1962); cf. Poczatek v. Zoning Board of Appeals, 26 A.D. 2d 556, 270 N.Y.S.2d 980 (1966).

27. Wakefield v. Kraft, 202 Md. 136, 141–142, 96 A.2d 27, 29 (1953); Colt v. Bernard, 279 S.W.2d 527, 530 (Mo.App. 1955); City of Louisville v. Puritan Apartment Hotel Co., 264 S.W.2d 888, 890 (Ky.1954); Stillbar Construction Co. v. Town of Harrison, Sup., 143 N.Y.S.2d 804, 806 (1955).

28. Downham v. City Council of Alexandria, 58 F.2d 784, 788 (E.D.Va.1932); Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 388, 38 A.L.R. 1479 (1925), cert. den. 273 U.S. 781, 47 S.Ct. 460, 71 L.Ed. 889; Hasco Electric Corp. v. Dassler, Sup., 143 N.Y.S.2d 240, 242–243 aff'd Sup., 144 N.Y.S.2d 857 (1955); McCurly v. City of El Reno, 138 Okl. 92, 94–97, 280 P. 467, 469–472 (1929); City of Dallas v. Meserole Bros., 164 S.W.2d 564 (Tex.Civ.App.1942); contra: Whittemore v. Town Clerk of Falmouth, 299 Mass. 64, 12 N.E.2d 187 (1937); Krajenke Buick Sales v. Kopkowski, 322 Mich. 250, 33 N.W.2d 781 (1948); State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W.2d 63 (1935); State ex rel. Fairmount Center Co. v. Arnold, 138 Ohio St. 259, 34 N.E. 2d 777, 136 A.L.R. 840 (1941); Kline v. City of Harrisburg, 362 Pa. 438, 68 A.2d 182 (1949).

"* * * [O]n January 11, 1961 [appellant] executed a deed of dedication conveying to the public a 'planting easement' thirty feet wide and 110 feet long adjacent to 17th Street and along the north end of the easterly 150-foot strip of the shopping center." [29]

This deed is contained in the official plan of the shopping center and was duly recorded in Bonneville County on February 6, 1962. Therefore "* * * a strip 30 feet wide along its front is dedicated to the public as a 'planting easement.' " [30] The public owns this easement across the front of appellant's property.

Appellant then sought permission to build a service station "with curb cuts necessary for access thereto as set forth on Exhibit A." [31] Although exhibit A was not admitted into evidence, other drawings admitted as exhibits show that "the application [by appellant for a gasoline station permit] called for curb-cut access onto 17th Street across the planting strip easement." [32] In effect, then, appellant demands access to his property across property owned by the public in addition to the "access easement [already appurtenant to appellant's land] across a 40-foot strip of land adjacent to, and immediately west of, the property." [33] On these facts, appellant has not shown how it was deprived of property without due process of law when it was prevented from appropriating the public's property rights for its gasoline station driveway. On the contrary, if the planting easement were owned by a private party instead of the city, then appellant would be required to pay compensation for its use of the easement.

The majority relies upon various cases for the proposition that the right of access from one's land to a public way is a property right which cannot be deprived by a municipality without some police power justification. Conceding the validity of this general statement, it is difficult to apply in support of appellant's position in this case since the city has not deprived appellant of any property. Appellant has access to its land over the appurtenant easement. Moreover, it is the public rather than appellant which owns the planting easement. Village of Sandpoint v. Doyle [34] involved an owner of land which extended fully to the wooden bridge to which he desired access. The landowner there did not have to cross property or easements owned by another in order to get access to his land. The Court held that the village could not absolutely forbid access to the public way but could "adopt reasonable rules and regulations with reference to the erection * * * of buildings and all approaches to the same, and entrance to * * * the street * * *." [35] Continental Oil Company v. City of Twin Falls [36] also involved an owner of land which extended fully to the street. An ordinance prohibiting driveways across sidewalks near schools was found invalid because the stated concern for safety had little basis in the evidence. The Court there stated, however, that "access to a public way across sidewalks [is] subject to the right of reasonable regulation by the municipality * * *." [37] These cases therefore do not indicate that a landowner has a free and clear right of access to public roads even when such an access must cross property interests owned by another. The oth-

29. District court amended finding of fact number 9.

30. District court amended finding of fact number 11.

31. Plaintiff's amended and supplemental complaint: Count 1, ¶ V; Count 2, ¶ IX; Count 7, ¶¶ VI and VII.

32. District court finding of fact number 18, which was somewhat amended as finding number 13; see amended findings

of fact numbers 18 and 27 to the same effect.

33. District court amended finding of fact number 11.

34. 14 Idaho 749, 95 P. 945 (1908).

35. Id. at p. 759, 95 P. 948.

36. 49 Idaho 89, 286 P. 353 (1930).

37. Id. at p. 107, 286 P. 359.

er cases cited by the majority hold only that a municipality must compensate a landowner when it destroys a pre-existing access.[38] White v. City of Twin Falls [39] holds only that in the absence of a police power justification it is unreasonable to restrict commercial activity to one side of a street. Whether indeed there is a sufficient police power justification for the ordinances in this case is a question left largely unanswered by the cases just discussed and is the question to which I now turn.

The majority points out that appellant would be entitled to a permit to build a gasoline station even if ordinances 1063 and 1115 applied to its application since a gasoline station is a permitted use under either ordinance. The majority overrides the city council's decision that a gasoline station should not be permitted if it will not be an integral part of the shopping center and if its access will traverse the planting easement. The majority goes on to substitute its judgment for that of the city council on the merits of the city planning issues involved by asserting that, since the service station exit may facilitate traffic movement and safety, "at least in a functional sense, the requested access would make the service station more of an integral part of the shopping center."

This approach fails to consider both certain zoning law concepts and basic principles regarding the proper relation of judicial and legislative power. Conceding that a gasoline station is a permitted use under these ordinances, it is another matter to conclude that any individual property owner in the RSC–1 zone is entitled to a permit as a matter of right. Ordinance 1063 defined "shopping center" as

"an area or tract of land specifically set apart and zoned to provide commercial services of various types, *according to an integrated approved plan.*" (Emphasis added).

That ordinance also defined "shopping center plan" as

"*an integrated plan, approved by the planning commission and the city council, for a shopping center,* on which is indicated the various amounts and locations of land to be devoted to stores, shops, service buildings, parking areas, driveways, service areas, planter strips, and other facilities * * *." (Emphasis added).

A residential shopping center district is then designated as an "RSC" zone, whose definition and purpose is further elaborated by the ordinance as

"a limited business zone, *planned as an integrated center in accordance with a comprehensive plan* and located adjacent to, near, or surrounded by residential zones and in which only such uses are permitted as are normally required for the daily local business needs of the residential vicinity or district, and which uses shall not be detrimental to the area to be served." (Emphasis added).

The use regulations then provide that "in an RSC zone no land shall be used and no buildings shall be used, erected or converted to any use other than the following:

"Service stations permitted within an RSC zone only when access thereto is limited to access from the interior of the shopping center without curb cuts additional to the curb cuts provided for the shopping center area or where the service station is located in compliance with all set-back requirements for the shopping center buildings. * * *"

So that the shopping center may be adapted to the neighborhood, the ordinance further provides in detail for the landscaping of the street sides of such centers by a "strip of lawn, shrubbery and/or trees at least thirty feet in width * * * except for permitted driveways."

38. Hadfield v. State ex rel. Burns, 86 Idaho 561, 388 P.2d 1018 (1964); Farris v. City of Twin Falls, 81 Idaho 583, 347 P. 2d 996 (1959); Hughes v. State, 80 Idaho 286, 328 P.2d 397 (1958).

39. 81 Idaho 176, 338 P.2d 778 (1959).

The superseding ordinance 1115 enacted by the city council in March of 1964 continues the permitted use of service stations but likewise makes it abundantly clear that the residential shopping center zone is to be developed through comprehensive plans approved by the city and designed to harmonize residential commercial needs with the surrounding property values and the residential amenities and characteristics. Landscaping is designated by the ordinance as an important means to this end:

"The privilege of providing services to the residents in the surrounding neighborhood carries with it a corresponding responsibility to construct and maintain the premise in harmony with the characteristics of the surrounding zone. Therefore, a landscaped strip of lawn, shrubbery and/or trees, at least thirty feet in width shall be provided and maintained [on the street sides] * * * except for permitted driveways."

To read these ordinances as allowing any individual property owner to place a gasoline station anywhere he pleases because it is a permitted use under the regulations is to nullify the vitally important contextual provisions of the ordinances which plainly require that the land in an RSC zone be developed in accordance with a comprehensive plan. This plan must be approved by the city council in its legislative capacity. The permitted uses may not exist as independent entities but must conform to the plan. The uses may not run rough-shod over the landscape design but must harmonize with the residential surroundings. This shopping center plan represents an attempt to conform to the best modern thought on the planning of city commercial centers.

The language of the ordinances in question also vests the city of Idaho Falls with discretion as to the approval of shopping center plans. Pursuant to its police power as expressed in these ordinances, the city may reject those plans which do not conform to its policy objectives of placing architecturally pleasing commercial centers in residential areas. *A fortiori* the city may also reject applications for building permits which do not conform to the comprehensive plan. This exercise of the police power may not be thwarted unless it is arbitrary, discriminatory or confiscatory.[40] In short, the denial of the permit must have some reasonable basis in fact and be guided by generally applicable standards.[41]

In City of Baltimore v. Muller,[42] plaintiffs owned land the larger part of which was zoned commercial. The owners entered a contract to sell the land to an oil company, contingent upon the acquisition of a permit for a gasoline station. The Board of Zoning Appeals possessed original jurisdiction of such matters, and, pursuant to ordinances allowing it to consider the protection of residents from noise, dust and gases, the character of structures in the vicinity, the effects upon nearby dwellings, the conservation of property values, and any other matters in the general welfare, the board denied the permit. The Court, stating that its scope of judicial review was most limited, held that the test for the validity of a refusal to allow a filling station at a given sight was whether there was a reasonable basis to support the refusal as an exercise of the police power. Added traffic hazards and the disapproval of the planning commission were found sufficient reasons for the refusal in that case.

40. McQuillin, Municipal Corporations §§ 25.147, 25.217; Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365 at 388–389, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926); City of Baltimore v. Muller, 242 Md. 269 at 279, 219 A.2d 91 at 96–97 (1966); Turner v. Cook, 9 Misc.2d 850, 168 N.Y.S.2d 556 at 559 (1957); Kidder v. City Council of Brockton, 329 Mass. 288, 107 N.E.2d 774 (1952); Fisher v. City of Irving, 345 S.W.2d 547 at 549 (Tex.Civ.App.1961).

41. Bassett, Zoning 54–56 (New York: Russell Sage Foundation 1940); Olp v. Town of Brighton, 173 Misc. 1079, 19 N.Y.S.2d 546 at 552–553 (1940).

42. Note 40, supra.

In Mrowka v. Board of Zoning Appeals,[43] plaintiffs owned a corner lot in an industrial zone and applied for a gasoline station permit. The board denied the permit under the statute there applicable whose ultimate standard was whether the use would unduly imperil the safety of the public. The Court of Common Pleas reversed the board and stated that it was irrational to distinguish gasoline stations from restaurants and retail stores, for example. Chief Justice Maltbie, speaking for the Supreme Court of Errors, reversed the lower court:

"To approve the court's reasoning would not only go against the judgment of the legislature but would destroy the right of a zoning board ever to refuse a certificate of approval for a gasoline station the proposed location of which was in an industrial zone, a conclusion which cannot be sound.

\* \* \* \* \* \*

"The [trial] court also concluded that the issuance of a license for the gasoline station at the location in question would be in no way harmful or detrimental to the public welfare; it was not for the trial court to substitute its judgment for that of the board [when] the only issue before it was: Could the board reasonably conclude that the presence of the gasoline station at that place would unduly imperil the safety of the public?" [44]

In the instant case, the ordinances require the city council to consider whether the proposed structure will be adapted to a comprehensive shopping center plan, whether it will blend with the surrounding residences, whether it will have an adverse effect upon nearby property values, and whether it will disrupt an architectural unity, as well as whether it will adversely affect traffic conditions. These are rational considerations, and a refusal of a building permit based upon them cannot be so arbitrary as to deprive due process. The city council reasonably could have concluded that a gasoline station which would disrupt the landscaped perimeter of an integrated shopping center must not be permitted.

The majority declines to give legal recognition to the architectural and aesthetic considerations which entered into the city's legislative decision to zone this land for residential shopping centers. In this respect it is not inappropriate to recall certain dicta by Justice Sutherland, in the Ambler Realty Co. case: [45]

"Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained a century ago, or even a half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained under the complex conditions of our day, for reasons \* \* \* which before \* \* \* would have been condemned as fatally arbitrary and unreasonable \* \* \*. In a changing world, it is impossible that it should be otherwise."

Courts have held, moreover, that aesthetic considerations are entitled to some weight in determining the reasonableness of zoning regulations.[46] Furthermore, ordinances based solely upon aesthetic considerations have been upheld.[47] In Berman v. Park-

43. 134 Conn. 149, 55 A.2d 909 (1947)

44. Id. at 154–155, 55 A.2d 911–912; see also Zelazny v. Town Board of Town of North Hempstead, Sup., 101 N.Y.S.2d 178 (1950); cf. State ex rel. Morris v. City of Nashville, 207 Tenn. 672 at 681–682, 343 S.W.2d 847 at 851 (1961).

45. Note 40, supra, 272 U.S. at p. 387, 47 S.Ct. at p. 118.

46. 122 Main Street Corporation v. City of Brockton, 323 Mass. 646, 650, 84 N.E.2d

13, 16, 8 A.L.R.2d 955 (1949); Barney & Casey Co. v. Town of Milton, 324 Mass. 440, 448, 87 N.E.2d 9, 14–15 (1949); Criterion Service, Inc. v. City of East Cleveland, 88 N.E.2d 300, 303 (Ohio App. 1949).

47. City of New Orleans v. Levy, 223 La. 14, 64 So.2d 798 (1953) (historic and architectural qualities preserved): Opinions of the Justices to the Senate, 333 Mass. 773, 783, 128 N.E.2d 557, 563 (1955) (historic districts of Nantucket

er,[48] the Supreme Court of the United States stated:

"The concept of the public welfare is broad and inclusive * * *. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress * * * [has] made determinations that take into account a wide variety of values. It is not for us to reappraise them." [49]

In State ex rel. Saveland Park Holding Corporation v. Wieland,[50] the Wisconsin Supreme Court upheld the constitutionality of an ordinance which prohibited the issuance of a building permit unless

"the exterior architectural appeal and functional plan of the proposed structure will, when erected, not be so at variance with either the exterior architectural appeal and functional plan of the structures already constructed or in the course of construction in the immediate neighborhood or the character of * * * the district * * * as to cause a substantial depreciation in the property values of said neighborhood."

In reaching this conclusion, the Court noted that zoning ordinances enacted pursuant to a municipality's police power by definition impose restrictions upon the use of private property; that where the interest of the individual conflicts with the interests of society as expressed by such ordinances, the individual interest is subordinated to the general welfare; that aesthetic considerations are an integral part of the public welfare; and that such an ordinance does not leave the issuance of building permits

to arbitrary discretion. Those principles are fully applicable to the instant case, and for all of the reasons stated above the judgment of the district court should be affirmed.

---

and Beacon Hill preserved); City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 485–487, 3 So.2d 364, 366–367 (1941) (attractiveness of resort area maintained).

48. 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

49. Id. at 33, 75 S.Ct. at 103. Cf. Blake, op. cit. note 10, supra, at pp. 140–142 (chapter entitled "To Determine That the Community Should be Beautiful").

50. 269 Wis. 262, 69 N.W.2d 217 (1955), cert. den. 350 U.S. 841, 76 S.Ct. 81, 100 L.Ed. 750.