792 P.2d 882

## The SOUTH FORK COALITION, an unincorporated association, Plaintiff–Appellant, and Cross–Respondent,

v.

## The BOARD OF COMMISSIONERS OF BONNEVILLE COUNTY, Idaho, said Board consisting of Clyde Burtenshaw, A. Wylie Snarr, and Clifford Long, Defendants–Respondents, Cross–Appellants.

### No. 17792.

Supreme Court of Idaho.

Jan. 29, 1990.

Rehearing Denied June 20, 1990.

Hopkins, French, Crockett, Springer & Hoopes, C. Timothy Hopkins (argued), Idaho Falls, for plaintiff-appellant, and cross-respondent.

Anderson, Pike & Bush, Blake G. Hall (argued), Idaho Falls, for defendants-respondents, cross-appellants.

BOYLE, Justice.

The South Fork Coalition (hereafter "South Fork") appeals the decision of the district court approving a final development plan of a planned unit development (hereafter "PUD") on the Hays ranch. We affirm.

On August 24, 1984, J.R. Hays and Sons, Inc. (hereafter "Hays"), owner of approximately 3,000 acres of agricultural ground in the Antelope Flats area of Bonneville County, applied for preliminary approval of a PUD consisting of sixty-six single family residential units on a portion of its property near the South Fork of the Snake River. The proposed development involves approximately 550 acres and is located in a G–1 Grazing zone. In addition to the sixty-six proposed residential units, the development

plans include a golf course and boat ramp. The sixty-six acres of property proposed to be developed are not used for agricultural purposes due to their location and terrain.

The Bonneville County Planning and Zoning Commission (hereafter "Commission") held a public hearing, and thereafter recommended denial of the proposed PUD. Hays appealed that recommendation to the Bonneville County Commissioners (hereafter "Board of Commissioners"), which held a public hearing and subsequently approved the preliminary plan.

South Fork, which organized after the hearing before the Board of Commissioners, filed a petition for review and a notice of appeal with the district court. The district court reversed the decision of the Board of Commissioners and Hays appealed to this Court which ruled that the appeal was premature and stated that the district court should have dismissed the appeal. *South Fork Coalition v. Board of Commrs.*, 112 Idaho 89, 730 P.2d 1009 (1986). This Court reversed in *South Fork I* because the Board of Commissioners had only given preliminary approval of the plan, had not rendered any final decision, and all administrative remedies had not been exhausted. *South Fork Coalition v. Board of Commrs.*, 112 Idaho at 90, 730 P.2d at 1010.

At the time Hays applied for preliminary approval in 1984, the Bonneville County zoning ordinance permitted the type of PUD proposed. However, in May, 1986, following the district court's ruling in the case appealed in *South Fork I*, Bonneville County amended ordinance 1–702 to permit only one residence for every sixty acres in A–1 and G–1 zoned areas.[1]

On December 28, 1987, Hays submitted an application for approval of a final development plan. The Commission recommended approval and the Board of Commissioners approved the final development plan. In its May 11, 1988 Findings of Fact, Conclusions of Law and Decision, the

Board of Commissioners expressly adopted and incorporated by reference its December 4, 1984 order as being "still applicable to this PUD proposal." South Fork filed a petition for review with the district court which found that the Board made a sufficient factual inquiry, that the findings of fact were supported by the evidence and the decision approving the plan was not clearly erroneous, arbitrary or capricious. South Fork now appeals from the district court's order affirming the Board's decision approving the final development plan.

South Fork asserts that the Board erred when it failed to apply the May 1, 1986 amended ordinance to Hays' application of a final development plan. In addition, South Fork argues that Hays' application for approval of a final development plan was not timely, and that the Bonneville County Comprehensive Plan prohibits the planned development.

I.

Standard and Scope of Judicial Review.

The standard of judicial review of an administrative decision is governed by the Administrative Procedure Act. I.C. § 67–5201. Idaho Code § 67–5215 defines the reviewing court's scope of inquiry and provides that the review shall be confined to the record. I.C. § 67–5215(g) sets forth the standard for judicial review of agency decisions as follows:

(g) The *court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions* of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions:

1. Bonneville County Zoning and Building Ordinance § 1–702(4)(a)(2), as amended in May, 1986, provides:

(2) *Beyond this area a dwelling with a minimum lot size of one acre and an average density of one lot per sixty acres will be allowed.*

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) *clearly erroneous* in view of the reliable, probative and substantial evidence on the whole record; or

(6) *arbitrary* or *capricious* or characterized by abuse of discretion or clearly unwarranted exercise of discretion. (Emphasis added.)

The Board of Commissioners is treated as an administrative agency for purposes of judicial review, *Intermountain Health Care, Inc. v. Board of County Commrs.*, 107 Idaho 248, 688 P.2d 260 (Ct.App.1984), *rev'd on other grounds*, 109 Idaho 299, 707 P.2d 410 (1985), and review of a zoning commission's denial of a zoning request is governed by the Administrative Procedure Act, I.C. § 67–5215(b) through (g). *Workman Family Partnership v. City of Twin Falls*, 104 Idaho 32, 655 P.2d 926 (1982); *Hill v. Board of County Commrs.*, 101 Idaho 850, 623 P.2d 462 (1981); *Walker–Schmidt Ranch v. Blaine County*, 101 Idaho 420, 614 P.2d 960 (1980); *Cooper v. Board of County Commrs.*, 101 Idaho 407, 614 P.2d 947 (1980).

■ This Court's responsibility and role in reviewing an administrative decision has been addressed on numerous occasions. First, there is a strong presumption favoring the validity of the actions of zoning boards, and we have upheld the validity of their actions whenever they are free from capriciousness, arbitrariness or discrimination. *Ready–To–Pour, Inc. v. McCoy*, 95 Idaho 510, 511 P.2d 792 (1973). The Bonneville County zoning ordinances expressly give special consideration to planned unit developments,[2] and the Court must apply the presumption of validity afforded to the county commissioners when adopting, interpreting and applying its zoning ordinances.

■ It is also well settled that we can review the record independently of the district court's review and decision. *Ferguson v. Board of Commrs.*, 110 Idaho 785, 718 P.2d 1223 (1986); *First Interstate Bank v. West*, 107 Idaho 851, 693 P.2d 1053 (1984); *Olson v. Ada County*, 105 Idaho 18, 665 P.2d 717 (1983); *Nicholls v. Blaser*, 102 Idaho 559, 633 P.2d 1137 (1981). A reviewing court may not reverse the findings of the administrative agency where the findings are clear, dispositive and supported by evidence in the record. *Van Orden v. State Dep't of Health & Welfare*, 102 Idaho 663, 637 P.2d 1159 (1981). Further, a "reviewing court may not substitute its judgment for that of the administrative hearing officer on questions of fact." *Id.* at 667, 637 P.2d at 1163. The agency's findings are binding even where there exists conflicting evidence. *Lampe v. Zamzows, Inc.*, 102 Idaho 126, 626 P.2d 782 (1981).

## II.

Amendment to Zoning Ordinance.

■ The first question before this Court is whether the ordinance in effect on August 24, 1984, when the initial application was filed, or whether the ordinance as amended on May 1, 1986 is applicable to the proposed PUD. South Fork contends that the applicable and controlling ordinance is the one amended on May 1, 1986, because it was in effect at the time of filing the application for final approval. Although a majority of courts from other jurisdictions have adopted that line of reasoning and held that a change in the law following an application for a building permit will be applied to the application,[3] Ida-

---

**2.** Zoning and Building Ordinance of Bonneville County § 2503 expressly provides priority status to PUDs and states:

Section 1–2503. *Priority Of PUD*

In all cases where there is a conflict with the language or requirements of this chapter dealing with the planned unit development and the language or requirements of any other chapter or section of this ordinance the language or requirements of this chapter shall be controlling.

**3.** *See* annotation, "Retroactive Effect of Zoning Regulation in Absence of Saving Clause on Pending Application for Permit," 50 ALR3d 596, § 3; and annotation, "Retroactive Effect of Zoning Regulation in Absence of Saving Clause on Validly Issued Building Permit," 48 ALR3d 13.

ho law is well established that an applicant's rights are determined by the ordinance in existence at the time of filing an application for the permit. *Cooper v. Board of County Commrs. of Ada County*, 101 Idaho 407, 614 P.2d 947 (1980); *Ready-To-Pour, Inc. v. McCoy*, 95 Idaho 510, 511 P.2d 792 (1973); *Ben Lomond, Inc. v. City of Idaho Falls*, 92 Idaho 595, 448 P.2d 209, (1968).

In *Ready-To-Pour*, this Court considered the issue and stated:

> We consider first the threshold question as to whether the applicant's rights are to be measured under Ordinance 85 in effect at the time of the application, or under Ordinance 133 in effect at the time this case went to trial. *Idaho has adopted the minority view that the applicant's rights are measured under the law in effect at the time of the application. See:* McQuillin, The Law of Municipal Corporations, § 25.155 (3d ed.1965). In *Ben Lomond, Inc. v. City of Idaho Falls*, 92 Idaho 595, 601, 448 P.2d 209, 215 (1968), we stated:
>
> > "At least in those cases like the present one, in which no zoning ordinance was pending at the time an application for a building permit is filed, *it is our opinion that an applicant is entitled to a building permit upon compliance with the then existing ordinance.*" (Emphasis added.)

95 Idaho at 513, 511 P.2d at 795.

In *Cooper v. Board of County Commrs. of Ada County*, 101 Idaho 407, 614 P.2d 947 (1980), we further reinforced Idaho's position with the minority jurisdictions that the ordinance in effect at the time of the application is controlling. On rehearing, we specifically addressed this issue and held that subsequently enacted ordinances would not be given retroactive effect, and the ordinance effective at the time of application was definitive of the parties' rights. The Court's rationale and analysis was stated as follows:

> Appellants and respondent jointly petitioned for rehearing, seeking clarification as to whether the Ada County Comprehensive Plan of 1968, which was in effect when the application for rezone was made, or the Ada County Comprehensive Plan of 1977 is to be applied on remand.

Appellants contend the 1968 Plan should be applied on remand, citing *Ready-To-Pour, Inc. v. McCoy*, 95 Idaho 510, 511 P.2d 792 (1973) and *Ben Lomond, Inc. v. City of Idaho Falls*, 92 Idaho 595, 448 P.2d 209 (1968). Those cases dealt with applications for building permits and subsequent enactment of zoning ordinances which were not pending before the governing body when the applications were made and, if given retroactive effect, would have defeated plaintiffs' rights to the permits. In *Ben Lomond* and *Ready-To-Pour*, *it was held the subsequently enacted ordinances could not be given such retroactive effect* and that *those effective at the time of application were determinative of plaintiffs' right* to the permits. The rationale for so holding was stated in *Ben Lomond* as follows:

> "[T]o hold for the City in the present case would mean that a city, merely by withholding action on an application for a permit, could change or enact a zoning law to defeat the application. It could, in substance, give immediate effect to a future or proposed zoning ordinance before that ordinance was enacted by proper procedure." (Emphasis added.)

101 Idaho at 411–12, 614 P.2d at 952.

Hays filed its application with the Commission on August 24, 1984. The ordinance in effect at that time permitted the planned unit development of the size, nature and scope that Hays proposed. The ordinance was thereafter amended on May 1, 1986 as § 1–702(4)(a)(2), and with the addition of the new sections, would no longer permit the development Hays had proposed in its 1984 application. However, the law is well established in Idaho that an ordinance in effect at the time of the original filing is controlling, *Cooper v. Board of County Commrs. of Ada County*, 101 Idaho 407, 614 P.2d 947 (1980); *Ready-To-Pour v. McCoy*, 95 Idaho 510, 511 P.2d 792 (1973); *Ben Lomond, Inc. v. City of Idaho*

*Falls,* 92 Idaho 595, 448 P.2d 209 (1968), and the decisions of both the Board of Commissioners and the district court in this respect are affirmed.

## III.

### Timely Filing of Application for Approval.

South Fork contends that Hays failed to timely file the application for approval of the final development plan and as such must refile for preliminary approval. This proposed procedure would obviously require Hays to comply with the provisions of 1986 amendment, and the PUD originally planned would be in violation of the new ordinance. In this case, preliminary approval of the PUD was granted by the Board of Commissioners on December 4, 1984, and the application for final approval was filed on December 28, 1987, more than four years later. In *Blechmann v. Blaine County,* 109 Idaho 181, 706 P.2d 70 (1985), this Court held that the two-year effective term of a conditional use permit continued to run, and in spite of the filing of an appeal the permit expired. However, the present case is clearly distinguishable from *Blechmann* because the Board of Commissioners, in the absence of a specific time period provided in the ordinance, advised Hays that the application for final approval of the planned unit development would have to be filed within one year of this Court's decision in *South Fork I.*[4]

During the appeal process, Hays apparently attempted to proceed with the approval process but was informed that no action would be taken by the Board of Commissioners until there had been a final court determination.[5] Due to the appeal by the Coalition in *South Fork I* and the County's instructions to Hays, the application and approval process ceased. Hays filed his application on December 28, 1987, within one year from the date of issuance of this Court's decision in *South Fork I,* and complied with the condition prescribed by the Board of Commissioners. The Board of Commissioners, in its first Finding of Fact, expressly found that Hays' application for approval of the final plan was timely filed. Under the circumstances of an interim appeal, the ordinance not having a specific time frame within which to file for final approval, and the county advising Hays they would take no action on the PUD until a final court determination, we hold that the filing for final approval was timely.

## IV.

### PUD Located In a G–1 Grazing Zone.

South Fork contends that a PUD may not be located in an area zoned as G–1 Grazing in Bonneville County. However, this assertion is not supported by the record because § 1–2505(2) of the Bonneville County Zoning Ordinance specifically provided that "a PUD may be located within any zoning district."[6]

4. The Board of Commissioners specifically addressed this issue in its May 11, 1988 Findings of Fact, Conclusions of Law and Decision:
    7) The Bonneville County Zoning *ordinance has no required time frame* for which a Planned Unit Development must be submitted for final presentation after approval of a Planned Unit Development in concept.
    8) The *applicant was informed by the County* that the County would require them to make application for final approval of the Planned Unit Development *within one year* of the Supreme Court's decision.
    9) That the application was received within the time requirements set by the County. (Emphasis added.)

5. Finding of Fact No. 5 provides: "The appellant was advised by the County that no action would

be taken on the continuation of the PUD approval process until a final court decision was obtained."

6. Section 1–2505. *Provisions Governing Planned Unit Development.*
    1. *Application.* The provisions of this section shall apply only to a tract of land to be developed of not less than five contiguous acres within a designated zone or zones, which tract is under single ownership or unified control, and for which an application for planned unit development is made as hereinafter provided. Public roads shall not be deemed to divide acreage for this purpose.
    2. *A PUD may be located within any zoning district.* (Emphasis added.)

## V.

## Comprehensive Plan Allows Hays' PUD.

█ South Fork further contends that the proposed PUD is inconsistent with the Bonneville County Comprehensive Plan. In *Bone v. City of Lewiston*, 107 Idaho 844, 850, 693 P.2d 1046, 1052 (1984), this Court held that "[C]omprehensive plans do not themselves operate as legally controlling zoning law, but rather serve to guide and advise the various governing bodies responsible for making zoning decisions." In *Balser v. Kootenai County Bd. of Commrs.*, 110 Idaho 37, 39, 714 P.2d 6, 8 (1986), this Court affirmed *Bone* and held that "[T]he determination of whether a zoning ordinance is 'in accordance with' the comprehensive plan is one of fact. As a question of fact, the determination is for the governing body charged with zoning—in the present case the Board of County Commissioners."

In *Ferguson v. Board of County Commrs.*, 110 Idaho 785, 718 P.2d 1223 (1985), this Court once again affirmed these principles of construction when considering comprehensive plans, and stated:

In *Bone v. City of Lewiston*, 107 Idaho 844, 693 P.2d 1046 (1984), and the cases following it, this Court provided that authority. In *Bone*, a unanimous Court held that *the "in accordance with" language of I.C. § 67–6511(b) does not mean that a zoning ordinance's land use designation must be exactly the same as the corresponding designation in the comprehensive plan.*

The applicant in *Bone* sought to have his land rezoned from low density residential use to limited commercial use. The city of Lewiston's land use map showed Mr. Bone's land as zoned for commercial use. Bone argued that pursuant to § 67–6511 the city was required to rezone his property in conformance with the map. On appeal, we rejected Bone's argument holding that "a city's land use map does not require a particular piece of property, as a matter of law, to be zoned exactly as it appears on the land use map." *Id.* at 850, 693 P.2d at 1052. Rather, *we held that the question of whether a zoning ordinance is in accordance with the applicable comprehensive plan is a question of fact for the trier of fact.*

"What a governing body charged to zone 'in accordance with' under § 67–6511 must do is *make a factual inquiry* into *whether the requested zoning ordinance* or amendment *reflects the goals of, and takes into account those factors* in, the comprehensive plan *in light of the present factual circumstances surrounding the request.*" *Id.* See also, *Balser v. Kootenai County Board of Commissioners*, 110 Idaho 37, 39, 714 P.2d 6, 8 (1986); *Love v. Board of County Commissioners of Bingham County*, 108 Idaho 728, 730, 701 P.2d 1293, 1295 (1985).

. . . .

As we stated in *Bone*, the question of whether a zoning ordinance is *"in accordance with"* the comprehensive plan *is a factual question which can be overturned only where the factual findings are clearly erroneous.* The governing body charged with zoning—in this case *the board of county commissioners— must make a factual inquiry* to determine whether the requested rezone *reflects the goals of,* and takes into account those factors in, the comprehensive plan *in light of the present factual situation surrounding the request.* The district court's review of these findings is governed by I.C. § 67–5215(b) through (g). Pursuant to that section, *the findings may only be overturned where they are clearly erroneous in view of the evidence in the record. Love, supra* at 730, 701 P.2d at 1295. (Emphasis added.)

110 Idaho at 787–88, 718 P.2d at 1225–26.

The Bonneville County Comprehensive Plan in the instant action calls for protection of open spaces, natural resources, the environment, preservation of historic and scenic areas, critical game management areas and recreation areas, and requires the county to limit urban-type development to areas in close proximity with areas already subject to urban uses. The Board of County Commissioners' Findings of Fact, Con-

clusions of Law and Decision, demonstrates careful consideration of the requirements of ordinance § 1–2520 as well as a factual inquiry into whether or not the proposal was in accordance with the Bonneville County Comprehensive Plan. The Boards' conclusion should be reversed only if found to be arbitrary and capricious. *Ready–To–Pour, Inc. v. McCoy,* 95 Idaho 510, 511 P.2d 792 (1973).

A review of the record in the present action supports both the Board of Commissioner's findings and the district court's decision on review.[7] Although there exist conflicting facts, the Board's decision and findings are supported by substantial evidence, were well written and carefully considered the issues presented. In its May 3, 1988 decision, the Board of Commissioners found the PUD to be in compliance with the county ordinances and that it would protect the public interest better than conventional development.[8] The findings of the Board of Commissioners are not clearly erroneous, arbitrary or capricious, and are supported by substantial evidence. Although others may have reached a different result or conclusion, it is the responsibility of the Board of Commissioners, as the author of the ordinance and the finder of fact, to make that determination. *Balser v. Kootenai County Bd. of Commrs.,* 110 Idaho 37, 714 P.2d 6 (1986). Accordingly, we affirm.

## VI.

### Attorney Fees.

The Board of Commissioners asserts a claim for an award of attorney fees on

appeal, however, South Fork raises genuine issues which have a basis in law and in the record. As such, an award of attorney fees to the Board of Commissioners would be inappropriate. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979).

The decision of the district court is affirmed. Costs to respondent.

BAKES, C.J., and McDEVITT, J. concur.

BISTLINE, Justice dissenting.

### INTRODUCTION

Before getting into my concerns with the majority's rather summary disposition[9] of this very important controversy, it is in order to set the stage and identify the players and their interests and aspirations.

Jurisdiction to initially decide the controversy is vested in three men who have been elected as county commissioners of that county. Their obligation in this circumstance is to impartially and fairly determine the controversy which arose when landowner to a scenic area, with holdings of 3,000 acres, sought county permission to develop a portion of that 3,000 acres into a housing development, which is referred to as a PUD. His objective presumably was monetary gain.

Contesting J.R. Hays & Sons, Inc.'s (Hays) application filed with the Board of Commissioners of Bonneville County

---

**7.** All exhibits and documents from the proceedings in *South Fork I* were included in the record before us with the exception of the Clerk's Transcript. However, a review of the Notice of Appeal and the Notice of Cross–Appeal filed herein demonstrates that both parties requested all records automatically included pursuant to I.A.R. 28, which would have necessarily included the Clerk's Transcript from *South Fork I.* Both parties have referred to portions of that record, and we have taken judicial notice of our own files from the prior appeal which contains that transcript. *City of Caldwell v. Roark,* 98 Idaho 897, 575 P.2d 495 (1978).

**8.** The Board of Commissioners stated the following:

That the proposed development plan is in compliance with the standards and criteria as required in the Planned Unit Development section of the Bonneville County Planning and Zoning Ordinance and the Bonneville County Compliance Plan as previously stated. That this PUD will better protect the public interests in this area than would a conventional development.

**9.** By this it is regretfully suggested that today's opinion for the Court gives short shrift to thousands of opinions heretofore issued which have thought it necessary to demonstrate the evidence which is said to sustain a finding.

(Board) was the South Fork Coalition, a group of residents of the involved area who sought to prevent the creation of a PUD on the edge of this pristine and preserved area. South Fork Coalition is an unincorporated association; it has officers, and it has retained counsel, as is true with Hays.

The Board also had retained counsel to aid it in its quasi-judicial deliberations, and in the preparation of its written decision. That decision is the cause of the controversy which wound its way through the district court of the Seventh Judicial District, Bonneville County.

This is the controversy's second appearance in this Court. On the first appeal little of our time was consumed because the Court determined that the appeal taken from the Board's decision was premature; hence the appeal was dismissed, and the cause was remanded for further proceedings before the Board, namely a determination as to whether the Board would grant or deny final approval of the Hays application. When the controversy first reached this Court Hays' PUD proposal had been granted only preliminary approval by the Board. It was at that point that the South Fork Coalition petitioned the district court to review the order which had granted preliminary approval. On conducting the judicial review of that order, the preliminary approval was reversed by the court, leading to the appeal in *South Fork I*, where, as stated, the appeal from a preliminary approval order was held to be premature.

It has been suggested that when South Fork first sought judicial review of the grant of final approval, Hays had no obligation or reason to appear or to respond because, it was said, the South Fork Coalition in its petition had sued the Board, and only the Board. That is a surprising misapprehension as to how the procedure works. When the Board ruled in favor of granting final approval to Hays, litigation before the Board was wholly concluded. The Board had ruled. South Fork Coalition's only remaining option was to seek judicial review of the Board's ruling. It decided to do so.

In petitioning the district court for judicial review, South Fork was required to designate whose decision it wanted reviewed. Obviously it wanted the Board's decision reviewed, and hopefully, overturned. Accordingly it named the Board as the agency which had made the decision of which complaint was made. That petition sought nothing from the Board, or the county over which it presided. To say that the Board was sued was grossly in error. The Board was simply identified as the decision maker. The petition pointed out the history of the litigation and pointed out that the Board had possession of the record, transcript, and exhibits. The petition for review was in all respects identical to the petition for review which had been filed in January of 1985, seeking review of the Board's grant of *preliminary* approval, other than for the fact this 1988 petition was seeking review of the grant of *final* approval.

Judicial review is not automatic upon request, but conditioned upon having exhausted all available administrative remedies. Any of the parties who were served with copies of the petition for review were at liberty to appear and (first) contest the right to be granted review, and (second) to contest the averments of error contended in the petition. The petition, both in 1985 and again in 1988, named all interested parties, to wit, the Board, the three members of the Board individually, the clerk, Mr. Hall who was the Board's attorney, Mr. Anderson who was Hays' attorney, and J.R. Hays & Sons., Inc. A certificate of service establishes that in both 1985 and again in 1988, all were served. No one contested the granting of review in the 1988 proceeding responsive to the petition's prayer that the *court* determine the method of appeal. The court did so, setting a time for the filing of a South Fork Coalition brief, to be followed by the filing of a Board brief. The briefs of both were timely filed. As to the 1988 petition, the record shows *no* appearance by Hays, or by its attorney, Mr. Anderson, although service of the petition was made upon Hays and its attorney.

The reporter's transcript of the court hearing, consisting only of arguments of Mr. Hall and Mr. Hopkins, and comments by Judge George, contains no testimony. No exhibits were introduced. Clearly there is no merit whatever in the assertion that South Fork's petition for judicial review of the Board's decision was a case of South Fork suing the Board.

With that background, the reasons for my inability to join the majority opinion need be stated. This will be done in sequence by dealing first with the errors or omissions which are the more egregious.

## I. SUBSTANTIAL EVIDENCE

Keeping in mind the principle that, in reviewing the final judgments of our trial courts, our primary concern is that the judgment must conform with the lower court's conclusions of law. Those conclusions in turn must have underpinning findings of fact upon which the conclusions can be predicated, and most importantly, there must be some evidence which substantiates those findings. The question then arises: Do we require less of boards acting in a judicial fact-finding capacity than we require of judges?

The answer, as found in today's majority opinion, is YES, we do require less, and require no disclosure of evidence substantiating the factual findings. Moreover, we will cover over a board's short-comings, as does the majority opinion today, by tritely declaring: "Although there exist conflicting facts, the Board's decision *and findings* are supported by substantial evidence,.... The findings of the Board of County Commissioners ... *are supported by substantial evidence* " without offering any references to the record which support that declaration. Majority Op. at 864, 792 P.2d at 889 (1990) (emphasis added). This declaration as to the findings being. supported by substantiated evidence is not of small moment. Four of those findings are the backbone of a majority opinion which upholds the Board, namely findings 7, 8, and 9, set out in full in footnote 4 on page 862, 792 P.2d page 887 of the majority opinion, and finding number 5, found in footnote 5 on page 862, 792 P.2d page 887 of the majority opinion.

For instance, finding Nos. 5 and 8 are the majority's predicate for the distinction it draws between this case and *Blechmann v. Blaine County*, where it reasons that "the Board ... advised Hays the application for final approval of the planned unit development would have to be filed within one year of the Court's decision in *South Fork I.*" Finding No. 9 simply capitalizes on the other two findings serving for the *ipse dixit* that the application was timely received.

It cannot be comforting for the trial bar to now be given to understand that the majority's assertion of "substantial evidence" was made directly in the fact of the South Fork Coalition's strongly worded protest and discussion encompassing page 12 through 17 of its opening brief, the most emphatic statement being that on page 16:

The Board specifically found that the deadline for Hays' filing of its final application had been extended by the Board. *However, the Board's decision in that regard, made as a part of its final decision in the case and unsupported by any facts or evidence in the record,* is not sufficient to establish compliance with the zoning ordinance requirements. The record contains no support for the Board's finding that *an extension was ever requested,* that the grounds for an extension were ever reviewed and considered, or that any other interested parties ever had notice of such a request or an opportunity to be heard with respect to it.

(Emphasis added.) The South Fork Coalition was wholly justified in complaining that, "when it appeared that the one-year deadline was an issue in the case, the Board simply ruled that an extension had been properly granted *without providing any support in the record.*"

This humble servant of the judiciary has searched the record again and again, all in vain, trying to find any evidence that supports these findings. My esteemed colleagues have been advised that there is not even a scintilla of evidence to support those

findings, and how gratifying it would be to be pointed toward any.

There is, indeed, much at stake in this case insofar as the two adverse parties are concerned. But, in a larger sense, where an appellate court indulges in declaring that there is substantial support in the record, and is unable to point to any, the integrity of the system is at risk. As a part of the general public, but also as an appellate judge entrusted with the duty to see that justice is being fairly administered, that which is declared by the majority to be "substantial evidence" gives me great concern, because it presently remains wholly unknown.

What I fail to see in the Court's opinion is the discussion which brings it to the conclusion which is reached, *i.e.*, to justify declaring that both the Board and the district court each performed its duty well. What are the conflicting facts? In short, it is not seen how the district court and this Court can justify an appellate decision which is based only on the naked assertion that the record has been carefully perused. The majority's theme seems to be that despite the presence of undisclosed pro and con, "we" conclude that the undisclosed and undiscussed evidence supports both the fact-finder, the district courts and this Court.

By far the largest problem is the ease with which the Board in the first instance, the appellate district court in the second, and finally this Court, dispense with notions of due process. The decision made by the Board is founded upon the well-prepared findings of fact which, although devoid of any supporting evidence, two appellate courts have accepted as gospel. One of these findings which the majority has readily embraced is "[d]uring the appeal process [*South Fork I*], Hays *apparently* [10] attempted to proceed with the approval process but was informed that no action would be taken by the Board of Commissioners until there had been a final court determination." 117 Idaho at 862, 792 P.2d at 887. That statement was based on the

rather slender reed of the contents of footnote 5, 117 Idaho at 862, 792 P.2d at 887, which reads: "Finding of Fact No. 5 provides: 'The appellant was advised by the County that no action would be taken on the continuation of the PUD approval process until a final court decision was obtained.'" Until today it had been thought impermissible for an appellate decision to be based on sheer surmise, but it may be asked, is it not conjecture to state that "apparently" Hays was attempting to proceed to a final approval, but was cut off from so doing by the Board? Now, if in fact the Board did determine that it wanted the finality of an appellate court decision before proceeding further, could it properly advise no one but Hays?

Were there even one piece of paper in the record that such a notice had been given to all involved parties, we would be seeing a horse of a different color. It is a common thing, where notice is concerned, to put it in writing. It simply does not do for the highest court in Idaho to predicate a decision which in any part relies upon a notice that *may have* been given, and yet may not have been given. The Court could this day come to a proper determination— one which would again send the parties back to Board proceedings where hopefully county business affairs will be handled in a businesslike manner. Far better that Hays and all other developers in all counties be required to do it by the book, *i.e.* by documenting in writing any action at the time it is taken, and no later, and not without advising all the interested parties.

Not only is it unacceptable to give full credence to Finding No. 5, but equally with Finding No. 6, which stated that following the Supreme Court decision in *South Fork I*, Hays was advised to continue the application process. Finding No. 6 also has all of the appearance of bootstrapping a naked assertion of a critical event, which purportedly took place after December 29, 1986, but with no indication as to how long after that date. It is likewise a finding devoid of any indication as to the manner in which

10. "Apparently" is an extremely loose word. What "apparently" happened either did, or it did not. Is the Court reduced to the point of conjecture?

the applicant was advised, namely, whether verbally or in writing, and further wholly uninformative as to who gave the notice and to whom it was given.

Finding No. 1 has been previously discussed as to its deficiency in not supplying the underlying data such as date filed, filed by what county employee, and when and how the filing took place, and who (on behalf of Hays) filed the request. As pointed out by South Fork Coalition's opening brief:

> The Board specifically found that the deadline for Hays' filing of its final application had been extended by the Board.... However, the Board's decision in that regard, made as a part of its final decision in the case and unsupported by any facts or evidence in the record, is not sufficient to establish compliance with the zoning ordinance requirements. The *record contains no support for the Board's finding that an extension was ever requested, that the grounds for an extension were ever reviewed and considered, or that any other interested parties ever had notice of such a request or an opportunity to be heard with respect to it.* Apparently, when it appeared that the one-year deadline was an issue in the case, the Board simply ruled that an extension had been properly granted without providing any support in the record. Even if the Board's conclusion were correct, it must be reversed because it does not comply with the requirement that there be a record revealing the existence of evidence supporting that conclusion and establishing that there was notice given to interested parties and an opportunity allowed to rebut the evidence submitted. *Cooper v. Board of County Commissioners of Ada County,* 101 Idaho 407, 614 P.2d 947 (1980); *Gay v. County Commissioners of Bonneville County,* 103 Idaho 626, 651 P.2d 560 (Ct.App. 1982).

Appellant's Brief, 16–17. The majority opinion has omitted any discussion of this issue by the simplistic expedient of ignoring it. Thus, there is more at stake here than correctly deciding the issues presented in this particular case. That which the Court does this day, should it persist in approving such procedures as the Board engaged in in this case, is to approve of governmental conduct which is not of law, but of fallible men.

## II. THE DISTINCTION BETWEEN BUILDING PERMITS AND VARIANCES

The majority's conclusion on the issue of which ordinance should apply pronounces that: "[T]he law is well established in Idaho that an ordinance in effect at the time of the original filing is controlling ... and the decisions of both the Board of Commissioners and the district court in this respect are affirmed," and case law is cited. The case law, however, reflects the state of the law with regard to building permits. It is a quantum leap for the majority to extend the application of building permit case law to zoning law and zoning variances. Zoning law was the foundation for the district court's resolution of the issues presented in this case. Some reasoning and rationale for extending the application of building permit case law should have been attempted, and at the least would have been better than no reasoning.

There are significant differences between building permits and PUD variances. Unlike a building permit, to which "an applicant is *entitled* ... upon compliance with the then existing ordinance," *Ben Lomond, Inc. v. City of Idaho Falls,* 92 Idaho 595, 601, 448 P.2d 209, 215 (1968) (emphasis added), there is no *entitlement* to a PUD zoning variance, even where an applicant has met all of the required conditions. The granting of such a variance is discretionary with the Board of Commissioners, and the fact that an applicant has jumped through all the right hoops does not necessarily guarantee that the Board will decide in the applicant's favor.

A building permit involves only *one* application; to obtain a PUD variance, one must submit *first* an application for preliminary approval *and* thereafter an application for final approval. A preliminary approval does not *a fortiori* entitle the appli-

cant to approval of the final application. On the other hand, the approval of a building permit is virtually automatic: If an applicant has complied with the conditions of the applicable ordinance(s), the applicant is entitled to the permit. Therefore, with regard to building permits, the case law which gives *effect to* the ordinances which were in place at the time of the application is understood—a change in the ordinance made after the application was filed cannot be retroactively applied. This is not so with regard to an application for a PUD variance. Where final approval is sought and the applicant appears to have complied with all the appropriate requirements, the Board nevertheless *still exercises discretion to grant or deny the application.* When it grants preliminary approval, "the [B]oard has only 'approved in principle the proposed planned unit development,' retaining jurisdiction to either approve or deny the final plan after they have reviewed it...." *South Fork Coalition v. Board of Comm'rs*, 112 Idaho 89, 90, 730 P.2d 1009, 1010 (1986). Thus a superseding or amending ordinance, enacted before the application for final approval is filed, must be followed and given effect.

### III. TIMELINESS

South Fork's brief also urges that the "Hays' final application should have been barred because it was not timely filed." The argument pertaining to that issue commences on page 14 of the brief. There the following dates and occurrences are laid out:

December 4, 1984 Preliminary approval granted.

August 22, 1985 District court reverses Board.

December 29, 1986 Supreme Court reverses the district court, with directions that the district court dismiss the appeal to it from the Board.

December 28, 1987 Hays submits his application for final approval.

May 11, 1988 Board gives final approval.

South Fork's brief points to the above dates in support of its assertion that the one year time requirement of the county's zoning ordinances had expired.

The order of final approval of May 11, 1988, in Finding number 1, recited: "That the applicant has *timely* filed a request for approval [of] the final plan Hays Ranch Planned Unit Development as amended at the request of the Bonneville County Planning and Zoning Commission." (Emphasis added.)

South Fork brings to our attention Section 1–2806(3) of the subdivision ordinance:

The application shall include one (1) tracing of the final plat, together with such other exhibits as are required for approval which have been prepared in accordance with the provisions of this chapter. *Such tracing and exhibits must be submitted to the Commission within twelve (12) months after approval of the preliminary plat; otherwise, such preliminary approval of the plat shall become null and void unless an extension of time is applied for* and granted by the Commission.... Zoning Ordinance, Section 1–2806(3) (emphasis added).

The word "must" used therein is mandatory. Where an applicant does not conform, he is not necessarily precluded forever, but he does have to start over because "otherwise, such preliminary approval of the plat shall become null and void unless an extension of time is applied for and granted by the Commission."

Extension "applied for" and "granted" as a necessity means in writing. Otherwise, from this case henceforth, due process, including an opponent's right to be heard, is in line for some hard times. Idaho Code § 67-5215 is the provision pursuant to which the courts review the decisions of county commissioners. Paragraph (c) of that section provides:

The filing of the petition does not itself stay enforcement of the agency decision. The agency may grant, or the reviewing court may order a stay upon appropriate terms.

A thorough review of this record failed to discover any evidence that a stay was ever applied for or entered. Thus the clock on

the one year requirement of the zoning ordinance continued to tick, and in fact the one year limit had expired before the case was even heard by this Court.

South Fork's brief correctly observes that, even if the one year expiration date was being tolled as a matter of law while the case went through the appellate process, the preliminary approval had been in effect, for time limitation purposes, for 365 days, as of April 12, 1987. Hays' application for final approval was not filed until December 28, 1987, which readily calculates out to *eight and one-half months beyond the deadline!*

This seemingly presented no problem to the Board, which skirted around it with so little fanfare as to suggest that such time limits will readily be deemed of no consequence whenever such is necessary to reach an objective. The Board's Finding No. 1 assumes that all that is required in such circumstances is a Board declaration in wholly conclusory language: *"That the applicant has **timely** filed a request for approval [of] the final plan...."* But where is the missing request?

South Fork's opening brief in this Court *accurately* asserts:

The Board specifically found that the deadline for Hays' filing of its final application had been extended by the Board.... *However, the Board's decision in that regard, made as a part of its final decision in the case and unsupported by any facts or evidence in the record,* is not sufficient to establish compliance with the zoning ordinance requirements. The record contains no support for the Board's finding that *an extension was ever requested, that the grounds for an extension were ever reviewed and considered,* or *that any other interested parties ever had notice of*

*such a request or an opportunity to be heard with respect to it.*

South Fork's Brief, 16. Emphasis added. The trial bench and bar may well take note of this most classic example of violation of the due process clauses of both the federal and state constitutions.

South Fork, in its brief, also reminds us of *Blechmann v. Blaine County,* 109 Idaho 181, 706 P.2d 70 (1985), a dandy little (less than one-half page) opinion with which I have some acquaintance, having been the undisclosed author.[11] My review of *Blechmann* results in affirming that South Fork has properly cited to it. The chronological history in *Blechmann* is not difficult. Blaine County, acting through its Planning and Zoning Commission and in turn the Board of County Commissioners, had issued Blechmann a conditional use permit. Where Planning and Zoning had set the permit's expiration date at five years, the Board in affirming modified it to *two* years.

The Board's order was entered on July 12, 1983, and was affirmed on an appeal to the Fifth Judicial District Court, Blaine County. In turn Blechmann's appeal to this Court was filed April 18, 1984, and oral argument was heard May 16, 1985. The Supreme Court opinion was issued on August 28, 1985, the full text of which is:

PER CURIAM.

This is an appeal from the decision of the district court, which affirmed the issuance of a two-year conditional use permit. The permit was granted by the Blaine County Planning and Zoning Commission on May 12, 1983, and affirmed, as modified, by the Blaine County Board of Commissioners on July 12, 1983. The Planning and Zoning Commission had granted a five-year permit, which the county commissioners reduced to two years in duration.

---

11. The majority opinion, 117 Idaho at 862, 792 P.2d at 887, acknowledges the existence of *Blechmann,* but readily disposes of it by observing it to be distinguishable from this case because the Board advised Hays that the application for final approval would not have to be filed until one year after the Supreme Court's decision in *South Fork I.* It would be a strange

and unacceptable style of doing business to give such advice verbally, and equally unacceptable that *all* of the involved parties were not so informed. Obviously, any interested parties, which necessarily includes South Fork, which were not informed thereby were deprived of the opportunity to record and argue their objections.

Frederick Blechmann, the appellant, alleges several procedural errors below. The best he could expect from this Court, though, would be a decision remanding the case for correction of the alleged errors. This would be useless, however, because the permit in issue expired May 12, 1985, rendering the procedural issues raised moot—the challenged permit no longer is in force. At oral argument, we were informed that an eight-year permit—one identical to the now. expired two-year permit—has been granted by the Blaine County Planning and Zoning Commission. We understand that decision is being appealed to the Board of County Commissioners, and may in time be re-examined by the district court, and then this Court. With the experience gained on this appeal, it is believed then in this second proceeding a record will be made and preserved which surpasses that before us here. Therefore, the appeal is dismissed as moot.

Costs to respondents; no attorney's fees.

BAKES, J., would affirm the judgment of the district court.

*Blechmann v. Blaine County,* 109 Idaho 181, 706 P.2d 70 (1985). The appeal was dismissed for mootness of the issue presented. This Court did so because Blaine County had affixed to the preliminary approval a two year expiration date. The two years had not been tolled and so had expired; and Blechmann, meanwhile, having recognized the problem, had commenced a new application to which the Blaine County Planning and Zoning Commission had affixed an eight year expiration date, which ruling was understood to be on appeal to the Twin Falls Board of County Commissioners.

So, in light of *Blechmann* it necessarily follows that Hays was required to begin anew unless it had timely requested and obtained an extension of the one year expiration date; otherwise Zoning Ordinance § 1–2806(3) *rendered the preliminary approval of the plat null and void.*

The Board of Commissioners for whatever reason, and for certain without any basis for doing so, simply favored Hays with Finding number 1, which blatantly states: "That the applicant has *timely* filed a request for approval [of] the final plan *Hays Ranch Planned Unit Development....*" This bare bones *ipse dixit* declaration by the Board was rather ingeniously given judicial approval by the district court. Without any mention of *Blechmann* the district court in its written appellate decision also favored Hays by upholding the Board's unsupported statement that the application for final approval was timely filed:

> The *finding of fact* by the Commission that the final application was timely filed is sufficient to satisfy any legal requirement that the time lapse between preliminary and final application was *reasonable.*

District Court Memorandum Decision (emphasis added). Noticeably conspicuous, "reasonable" was *not* any part of the language which comprised § 1–2806(3). Nor was it a word used by the Board when it made its written decision approving the *preliminary* application which Hays had submitted. Therein the Board stated (on the final page) that Hays was "required to pursue an application for final approval as provided in Chapter 25 of the Bonneville County Zoning Ordinance." Earlier in that same written decision the Board observed that "[t]he application before this Board is for approval of a preliminary development plan pursuant to Plan Unit Development approach outlined at Chapter 25 of the Bonneville County Zoning and Building Ordinance." Chapter 28 provides the requirement that "the preliminary approval of the plat shall become null and void unless *an extension is applied for* and granted by the Commission." Zoning Ordinance § 1–2806.

Clearly, there needs to be—in the record—evidence of a request by Hays for an extension. Equally clear, there is none to be found. Were there a request, my notion of due process would require proof that notice of that request was duly served on South Fork, and also should require that notice thereof be served on any other interested parties, and likely to the general public as well.

The Board's brief filed in this Court recognized the problem presented by its having stated in Finding No. 1 that Hays had requested an extension and that the County had granted an extension. Part A(2) of the Board's brief, at page 21, recites Finding No. 1, earlier mentioned, and also Finding No. 5, that "[t]he applicant [Hays] was informed by the County that the County would require them to make application for final approval of the Planned Unit Development within one year of the Supreme Court's decision. See Finding of Fact No. 8." [12] The discussion in Part 2 ended with the bare conclusion that "... no notice and public hearing are required prior to the County Commissioners exercising their discretion in granting a *requested* extension." [13] The Board's brief recognized that the Board was confronted with the extremely serious issue of lack of procedural due process. Respondent's brief, 24. The assertion is made that "[a]ppellant [South Fork Coalition] failed to raise the issue of procedural due process before the Bonneville County Commissioners or the District Court and therefore should be precluded from raising the issue at this time." *Id.*

This assertion, as to proceedings before the Board, borders on the ludicrous. It was only after the proceedings on remand, following this Court's decision in *South Fork I,* that the Board in its written decision of May 11, 1988, purported to advise any person or entity that Hays at some undisclosed time and place had "*timely* filed a request for approval [of] the final plan Hays Ranch Planned Unit Development." From that decision appeal was taken to district court. Obviously South Fork, without any forewarning of what *would* be written in the Board's decision, could not

raise an issue which surfaced only therein. The district court was the first tribunal before which the assertion of failure of procedural process could be, and was, made.

The majority's cursory treatment of this important due process issue leads one to believe that we have returned to the state of affairs that existed before *Cooper v. Bd. of County Comm'rs of Ada County:* "[T]he discretion of local zoning bodies ... remain[s] virtually unlimited in the determination of individual rights" and thereby the majority "condone[s] government by men rather than government by law." *Cooper v. Bd. of County Comm'rs of Ada County,* 101 Idaho 407, 411, 614 P.2d 947, 951 (1980).

## IV. WHICH ORDINANCE APPLIES

The majority also fails to discuss that the approval of the PUD was granted by the Board because the Board believed that such was the lesser of two evils, in that the Board believed that Hays was correct in the contention that as an alternative (if the PUD was not approved) Hays would and could simply divide his land into ten acre parcels, which subsequent purchasers were free to develop in any manner they chose so long as some agricultural purpose was served thereby. Findings of Fact, Conclusions of Law, and Decision re: Hays' preliminary application, 2. This assumption is invalid. Even assuming, *arguendo,* that the prior ordinance continued to govern Hays' PUD proposal, the application of that ordinance would not have "grandfathered in" for future development all of the

---

12. Finding of Fact No. 8 is the same identical language, hence there was hardly any need to see it twice.

13. The Board did not attempt to provide any authority for this statement. Implicit from the tenor of the statement is the concession that no notice of any application for an extension was given to anyone. Similarly, there is the implicit concession that the Board did not give any notice to anyone that it proposed to *sua sponte* grant an extension. Any reader is at liberty to make of this as he or she will. For the Board to

profess after the (supposed) fact that at one time, on perhaps an oral request responded to by the nod of the head (which could be one assumption), an extension was granted, strongly does not accord with orderly process, as well as with accepted notions of due process. The Board at all times appears to have had the benefit of extremely competent and experienced counsel, and, correctly or incorrectly, it is believed that the same counsel probably was the drafter of the Board's well-written decision approving the PUD.

3000 acres owned by Hays (or any new owner to whom it might transfer the property or a part thereof). Any such new development would therefore be required to comply with the new ordinance, which mandates a housing density of not more than one unit per sixty acres of land. Even had Hays included in his application the entire 3000 acres it owns, rather than the 550 acres here at issue, it would have been able to construct a maximum of only 50 houses on 50 sixty acre lots. A PUD variance under the new ordinance would increase that number to a maximum of 57.5 houses (still less than the sixty-six houses in Hays' present proposal). These limits would apply equally to any other developers or purchasers of the property, thus preventing the sort of piecemeal development contemplated by Hays. In short, the alternative, namely the *worst* of the two evils, was not viable.

That the Board was genuinely concerned about such piecemeal development is evident in both decisions of the Board, *i.e.* preliminary approval and final approval, which are peppered with references to the likelihood of such development. Preliminary findings at 2, 4, 6, and 7; Decision on final application at 3. The Board's worry that such piecemeal development was both possible and imminent appears to have motivated the decision of the Board to accept the Hays' PUD as the lesser of two evils. Therefore, because the Board's assumption was not well founded, the final decision in light of the considerable impact that worry must have exerted on the Board is at the least subject to close scrutiny.

## V. COMPLIANCE WITH THE MEMORANDUM OF UNDERSTANDING AND THE COMPREHENSIVE PLAN

A Memorandum of Understanding, or "MOU," which predated the Hays application by three years, was entered into between the United States Department of Agriculture, Forest Service, Targhee National Forest; the United States Department of Interior, Fish and Wildlife Service; Bureau of Reclamation; Bureau of Land Management; and the Idaho Department of Fish and Game. The signatories thereto are all persons well-respected in their chosen fields: John Burns, L.A. Henrhoff, L.W. Lloyd, Robert Buffington, and Jerry Conley, respectively. The MOU specifically concerned the South Fork of the Snake River. The preamble to the document included six predicates, which were followed by a statement of ten objectives that the five agencies planned to obtain by their collective efforts. Those objectives are:

1.  The Area of Concern deserves coordinated consideration in future management decisions and activities; and,

2.  Until long term objectives (approved land and resource use plans) regarding future use of the area's resources have been established, we plan to manage the public land and resources within our existing authorities, responsibilities and limitations to maintain existing uses and values and improve them when possible; and

3.  If a significant management change that may impact the Area of Concern is considered by one of the signatory agencies, it will be proposed to the others for review and comment before implementation; and,

4.  This MOU does not preclude future resource studies in the Area of Concern but rather encourages them. We may identify key study needs and encourage action on the same by any interested university, agency or other research organization; and,

5.  While our interim management does not apply to associated private lands, we would encourage the owners and managers of these private lands to follow suit; and

6.  These associated private lands should be considered with appropriate public involvement during future resource evaluations by governmental agencies; and,

7.  We will encourage Bonneville County to address the identified resources and "Area of Concern" in

its review and updating of the County Comprehensive Plan; and,

8. It is understood this MOU is to be accomplished within existing authorities and is not intended to supersede previous agreements or existing agency responsibilities. Nor, will it preclude a full evaluation of management alternatives in present or future management planning processes; and,

9. We plan to meet annually, at a minimum, in February of each year to evaluate the statutes of the Area of Concern and any related matters; and

10. A signatory agency may withdraw from this MOU by 30 days written notice to all other participating agencies.

Bearing directly on the Hays application, filed three years later, are objectives (6) and (7).

The statements of accord, contained in the documentation which should have been highly pertinent to the Board of Commissioners' decision-making, demonstrates that the five agencies were of a single mind that throughout the entire area timber harvesting and firewood cutting would be precluded; that some livestock grazing would be allowed to continue (as then presently permitted); that recreational use was considered to be then presently at an acceptable level; that more vehicle access would not be developed, nor would camping facilities be improved except where doing so would enhance wildlife; development of free-style campgrounds would have to be on an individual basis; that commercial river users would be required to obtain individual camping authorization; that wildlife habitat maintenance or improvement would be accomplished as much as time and funding permitted; that protective measures would include seasonal restrictions, area use restrictions, fire management, and public information programs; that systems of existing roads and trails would be maintained, but no new roads or trails were planned; that plans would be made for optimum management of the area's water

and related land resources and potential resources to meet present and future needs, including evaluation of the area's potential for hydropower and irrigation storage development, plus evaluation of opportunities to enhance fish and wildlife habitat and recreation opportunities; that water flow would be coordinated with goose reproduction during the spring months of March 15 through May 25; that trapping and hunting of fur bearing animals would be constrained as necessary to insure the maintenance of viable fur bearer populations within the area; that there would be a program of encouragement and support for needed distribution, abundance, habitat requirements and ecological research for bald eagle and blue heron nesting; that big game herds would be either increased or maintained at present levels while continuing to allow consumptive use in coordination with broadening the recreational base of the big game resource; and that game fishing seasons would be adjusted and regulated so as to preserve and enhance populations of cutthroat and brown trout.

The Statement of Objectives of the five agencies undoubtedly had considerable influence on the Bonneville County Planning and Zoning Commission, which came to the conclusion that this area, virtually a rare gem of the mountains, should not be invaded by a housing development. The individuals who comprised that Commission were undoubtedly appointed by reason of each having a respected degree of experience in relation to planning for the future.

With the stage thus set, it is in order to ascertain the extent of consideration given to the Memorandum of Understanding by the County Commissioners in coming to a conclusion contrary to that of the Planning and Zoning Commission, which takes us to its written findings, conclusions, and decision dated December 4, 1984. Attention is first drawn to page 3 thereof where the Board states: "In determining whether or not approval of the preliminary application for development should be granted, we have examined the general criteria of the Bonneville County Comprehensive plan

with regard to land use. We make the following findings with regard to the pertinent criteria ..." The pertinent criteria listed and then discussed total eight in number, but are designated by letters, (a) through (h). Criteria (a) is actually founding the general goals of the Bonneville County Comprehensive Plan as objective (3) of the first goal. Criteria (b) similarly is found as objective (4) of the first goal. Criteria (c) is found as objective (1); criteria (d) is found as objective (1) of the fifth goal; (e) is found as objective (1) of the sixth goal; and (f) is found as objective (3) of the sixth goal. Criteria (g) is not found in the comprehensive plan, and (h) is also not found in the comprehensive plan. It is in the discussion of criteria (c)'s objective of "protecting natural resources in line with national environmental goals," done under the furtherance of goal (2), denominated as "an area wide plan for water, sewer, and storm sewer development and pollution abatement," that the Board strangely chose to address the environmental issues. Giving absolutely NO recognition whatever to the five agency Memorandum of Understanding or of any of the other written or verbal testimony in opposition to the Hays plan, the Board summarily observed that there was such testimony by "individuals." It is best to set forth in full the Board's unique disposition of the evidence opposing the Hays application:

(c) *Protect natural resources in line with national environmental goals.* Most of the testimony opposed to the planned unit development centered on the issue of the important environmental features of the locality. Many of the individuals who testified indicated that the South Fork of the Snake River should be classified as a wild and scenic river by the federal government thereby eliminating the type of proposed development. We note, however, that the determination of what river should be classified as wild, scenic and/or recreational remains a federal legislative decision. The Bonneville County Comprehensive Plan mandates that Bonneville County recognize the national environmental goals and attempt to protect and enhance environmental goals and attempt to protect and enhance environmental features consistent with those federal goals. The South Fork of the Snake River is classified as a recreational river. As such, the federal government has indicated that the presence of extensive residential development and a few commercial structures are acceptable. See Federal Register Vol. 47, No. 173, Tuesday, September 7, 1982, page 39461. The appellant's proposed development is consistent with both the national and county environmental goals. Moreover, development of the proposed project as planned unit development ensures that Bonneville County will have greater controls over the orderly development of the property thereby insuring greater protection of the environment than would otherwise be provided.

Bonneville County Board of County Commissioners Findings of Fact, Conclusions of Law and Decision, December 4, 1984, 3–4.

Other statements by the Board were equally conclusory in nature and devoid of any rationale or substance:

(d) *Encourage the development of a variety of residential types.* The proposed development would provide for additional summer recreational housing in Bonneville County. The use of a planned unit development for summer recreational housing will provide a new type of summer recreational housing not previously provided in Bonneville County.

(e) *Reserve, through public ownership and/or easements, land as permanent open space, as a means of protecting the environment and preserving a way of life in Bonneville County.* As noted by this criteria, open spaces should be provided by the public at public expense and not at private expense. The opponents to the planned unit development would impose upon a private individual at private expense, the cost of maintaining permanent open space for public ownership. The Bonneville County Comprehensive Plan and Zoning Ordinance has never contemplated such a burden upon any tax payer. While the land in question may be worthy of public

ownership, Bonneville County does not have the means whereby to convert said property to public ownership. While other sources of public ownership may be available, no evidence of such was presented to the Board.

(f) *Provide for expansion of recreation needs and areas as the population expands.* The recreational facilities of Bonneville County, both public and private, are utilized at a near optimum rate, additional recreational facilities are needed. This development will provide for expansion of recreational areas.

*Id.* 4–5. As stated above, (g) and (h) do not from this record appear to be any part of Bonneville County's comprehensive plan.

In sum, it is seen that the Board, more or less, paid lip service only to the evidence which was put before it. Five substantial governmental agencies and the National Conservancy presented a compelling case for the preservation of this unique area. It is not seen in the least that the Board was able to justify the reversing of its own Planning and Zoning Commission in the face of a record which clearly required otherwise.

### VI. THE ENVIRONMENTAL CONCERNS OF RESIDENTS AND GOVERNMENTAL AGENCIES

Environmental impact was very much an issue throughout Hays' attempt to obtain approval of his PUD. This history started in August 1984, with the Bonneville County Planning and Zoning Commission turning down the Hays application in mid-October 1984. The application was then laid before the three Commissioners who comprised the Board. The Board specifically reversed the Planning and Zoning determination and approved the application. In turn, the controversy went before the district court, the Honorable Grant Young, where the Board was reversed. Further proceedings were in this Court, where the appeal was dismissed as moot.

A principal issue in the initial proceedings before Planning and Zoning, and in turn the Board, was the preservation of the area which encompassed the Hays proposed PUD. After Planning and Zoning had ruled against the project and further proceedings took place before the Board, interested state and federal agencies wrote to the Board in order to explain their concerns. The Idaho Department of Fish and Game, Region VI, per director Tom Reinecker wrote to voice that agency's opposition. That letter in full is worthy of careful consideration:

The Idaho Department of Fish and Game is opposed to the planned Hays Ranch development because of its impacts on fish and wildlife resources. In addition to the importance of the South Fork for Fisheries, this area is used by big-game year-round, Canada goose nesting and brooding, bald eagle nesting and numerous other nongame species.

The South Fork, Snake River is managed for wild cutthroat and brown trout populations. As a result of declining cutthroat populations, the Department enacted restrictive regulations to limit cutthroat harvesting beginning in 1984. Over harvest prior to 1984 was directly related to increasing fishing pressure in recent years. The location of the planned unit development and boat launch access will result in increased angler and recreational boat use in the vicinity of the Hays development. Increased angler effort will further impact wild trout stocks resulting in additional restrictive measures to protect and enhance this wild fishery.

Wildlife depredation problems will occur in the development. Browsing by big gams animals (deer, elk, moose) will damage ornamental shrubs around houses and on the golf course, especially during winter. In addition, big game and Canada geese will be attracted to and damage golf course greens and turf during spring and early summer. These depredation problems can be costly both to homeowners and to this Department.

Irrespective of how well intended leash and kennel laws are, pets often chase and kill wildlife in the vicinity of such developments. Winter recreation activities such as snow machining and cross-

country skiing would increase in the area as a result of the development. These activities harass big game at a time when energy reserves are at a premium, and displace them from preferred habitat.

Several pair of bald eagle, a threatened species and our national bird, nest along the South Fork. One nest is near the planned development. Bald eagle nest abandonment as a result of development and human activity has been well documented in Wyoming, Montana and Yellowstone National Park.

Probably one of the greatest misconceptions about impacts of development on wildlife is that wildlife will move to other areas. In most cases this is not true. If adjacent areas are suitable for wildlife they will already be occupied. Additional animals will either force out the animals presently occupying the area or will be left with no room themselves. The loss of wildlife habitat is a serious problem with developments in riparian habitats. The greatest long term impact in approving the development is that it will set a precedent for future applications along the river. Past applications for development have been denied. Approval of this application would make it difficult for the Board to deny future applications. The cumulative effects of additional development with the areas with the associated habitat loss and increased human activity will result in more restrictive hunting and fishing regulations and, loss of wildlife and recreational opportunity. We thank you for the opportunity to comment on this application.

O'Dell A. Frandsen, District Manager for the United States Department of the Interior, Bureau of Land Management, also wrote in opposition to the PUD proposed by Hays:

The Bureau of Land Management (BLM) actively manages several hundred acres of public land adjacent to and in the general area of the Hays Ranch Planned Unit Development. As administrators of these public lands, we would like to provide written and oral comments to the Commission on this subject.

The proposed development directly adjoins BLM-managed lands. These lands are managed under the South Fork of the Snake River Memorandum of Understanding (MOU), a copy of which is enclosed for your information. [Portions of the MOU are incorporated in this dissent.] The MOU was developed by four federal agencies and one State agency on a 27 mile stretch of river to coordinate the overall management approach for the most unique ecosystem in the State of Idaho (U.S. Fish and Wildlife Service). Since the development of the MOU our Idaho Falls BLM District and the Targhee National Forest have undergone major planning efforts for the lands they administer. Both agencies have brought forward the MOU as the directing guidelines to evaluate any proposed action on our respectively managed lands.

The South Fork of the Snake River is within easy driving distance of approximately ⅓ of the people of Idaho. The River's main attribute that makes it so attractive is its natural setting which has few man-made intrusions and developments. It is a slow moving river where the average family can visit and enjoy with safety and with a minimum of special equipment. Our general management goal is to maintain the natural qualities that now exist in the river corridor. The Hays Ranch proposal is in direct conflict with the management goals and public resources on the adjoining public lands. A County zoning change or variance in this area would make it difficult for us to meet our management objectives in this section of the river. Values that will be adversely affected include bald eagle nesting, a major fishery, important wildlife habitat, and scenic qualities.

We submitted a comment letter to the Planning and Zoning Commission [see below] that details the majority of our concerns. After reviewing that letter and considering all other information presented, we hope that you will follow through with the Planning and Zoning Commission's recommendation to deny Mr. Hays' development request. This decision

would continue with the precedence established in prior rezoning requests and help protect the values and integrity of the South Fork Canyon. It would also serve the wishes of the majority of the citizens who have expressed to us a need and desire to maintain the present character of this segment of the Snake River.

In addition, O'dell Frandsen had written in opposition to Mr. Steven Serr, Administrator, Bonneville County Planning and Zoning Commission:

The Bureau of Land Management (BLM) actively manages several hundred acres of public land adjacent to and in the general area of the Hays Ranch Planned Unit Development. As administrators of these public lands, we would like to provide written and oral comments to the Commission on this subject.

The proposed development directly adjoins BLM-administered lands. These lands are managed under the South Fork of the Snake River Memorandum of Understanding (MOU), a copy of which is enclosed for your information. The MOU was developed by four federal agencies and one state agency on a 27-mile stretch of river to coordinate the overall management approach for the most unique ecosystem in the State of Idaho (U.S. Fish and Wildlife Service). Since the development of the MOU our Idaho Falls BLM District and the Targhee National Forest have undergone major planning efforts for the lands they administer. Both agencies have brought forward the MOU as the directing guidelines to evaluate any proposed action on our respectively managed lands.

The Hays Ranch proposal is in direct conflict with the management objectives for the adjoining and nearby public lands. A county zoning change or other variance in land use that would allow this development would make it difficult for us to meet our management objectives in this section of river. Briefly, these objectives are to maintain the river's wildlife, recreation, scenic, and natural values.

In 1983, BLM, the Forest Service and the Idaho Department of Fish and Game conducted a recreational use study along the South Fork from Conant Valley to Heise. Recreationists were interviewed from May through October and asked to comment on what the river's most important values are and how they should be managed in the future. A strong majority, over eighty percent, listed wildlife, scenic and recreational values as the most important and indicated that management should be directed to maintain these values.

The proposed development would have both direct and indirect impacts on highly valued wildlife habitat. Bald eagle nesting occurs within 400 yards of the proposed development. Increased human activity, associated with the project, would have adverse impacts on the eagles. Bald eagles are a federally listed endangered species and we have an obligation to provide protection for these birds whenever possible. Prime habitat for wintering and summering big game would also be affected. Although the habitat on public land would not be physically disturbed by the development, animals would discontinue use because of increased human disturbance. The development would provide year round access that would encourage snowmobiling along the canyon rim, cross-country skiing in the bottom areas, and increase boating traffic. These impacts and others linked with the project would adversely affect big game species and nesting waterfowl.

Scenic and natural values would be degraded in the vicinity of the proposed development by placing structures and improvements in a relatively natural setting. This natural setting, without developed recreational facilities, is a major reason recreationists are attracted to the river and public lands. The presence of such facilities, within the heart of the South Fork Canyon, would diminish the quality of the remarkable recreation opportunities offered, change recreational use to more developed forms and discourage some visitors from returning at all. In addition, the development would be a

contrasting element in the middle of a scenic 26–mile boat trip between Conant Valley and Heise, which has become increasingly popular in recent years.

We submitted a comment letter to the Planning and Zoning Commission ... that details other concerns on the proposal. After reviewing that letter and considering all other information presented, we hope the Commission will deny any requests for zoning changes or variances that would allow such developments. This decision would continue with the precedence established in prior rezoning requests and help protect the values and integrity of the South Fork Canyon. It would also serve the wishes of the majority of the citizens who have expressed to us a need and desire to maintain the present character of this segment of the Snake River.

Robert L. Meinen, Director of the Idaho Department of Parks and Recreation, wrote to Clyde Burtenshaw, Chairman of the Bonneville County Planning and Zoning Commission:

> The Idaho Department of Parks and Recreation is concerned about the future of the South Fork of the Snake River. The agency has long recognized this segment of beautiful, free-flowing waters as a highly significant natural and recreational resource to the State of Idaho. As the Bonneville County Planning and Zoning Commissioners prepare their decision on the Hays Ranch Property, I encourage your consideration of the South Fork as an important part of Idaho's natural heritage. Much of the unique character of this river are its fabulous scenic beauty and distinctive natural setting.
>
> Development of the South Fork will be a highly controversial issue during the next few years and the Commission's leadership role will be a major factor in mediating those controversies.

Charles E. Stevenson recounted in a letter to the Bonneville County Commissioners his testimony:

> The following paragraph is substantially the text of the testimony that I presented on the evening of November 19, 1984, in the Bonneville County Courthouse on behalf of the Idaho Board of the Nature Conservancy:
>
> "My name is Charles E. Stevenson. I reside at 1538 Falcon Drive in the town of Ammon in Bonneville County. I am testifying on behalf of the state of Idaho Board of Nature Conservancy. The Nature Conservancy is a national organization whose purpose is evident in its name. In Idaho, a principal project of the Nature Conservancy is Silver Creek, which has preserved for a number of years, and markedly improved, a major Idaho trout fishery, along with adjacent lands, for public use. Other Idaho projects of the Conservancy include the Birds of Prey area, a desert area in Western Idaho, Soldier Creek (west of Silver Creek) which presently harbors a rare fish species, and several projects in North Idaho. On behalf of the Idaho TNC Board, I am authorized to state that this Board, with the support of the national TNC organization has examined the Hays Ranch proposal in its previous and present forms and in respect to its location on the South Fork of the Snake R. It recognizes that the area along the Snake which is the subject of this proposal is a significant riparian habitat and possesses excellent wildlife values and an exceptional fishery. The Nature Conservancy will strongly support its preservation in appropriate ways."

Carl Atamanczyk, Public Relations person for the Idaho Falls Chapter of the Idaho Trail Machine Association, wrote in opposition to the Bonneville County Planners:

> My name is Carl Atamanczyk. Presently I am the Public Relations Chairman for the Idaho Falls Trail Machine Association, one chapter of 4 other chapters in Idaho with nearly 600 family memberships statewide, including 85 families in this area alone.
>
> I am here tonight to express deep concern and opposition to the Hays Ranch Development proposed on the South Fork of the Snake River.
>
> This area is presently used for multiple recreational enjoyment by trail bike rid-

ers, horseback riders, hikers, bird watchers, river floaters, fishing buffs, picnickers and other citizens who enjoy the area for the outdoor values it presently offers the general public on an equal basis.

A condominium development of any magnitude will certainly detract from the area and further threaten wildlife that depend on their present environment to survive and reproduce.

Our Association does not advocate non-development, as long as its occurrence is in areas more suitable to sustain the impacts, whenever possible. On the South Fork of the Snake River, this isn't the case.

To save condominium purchasers or users a 25 to 30 minute drive can certainly not justify the development to go ahead in this area.

We would kindly urge the Bonneville County Planners to disapprove of the Hays Ranch Development to proceed, in order to preserve the present environment of the area and to honor the wishes and desires of the recreating public and the sensitive and very important requirements of the wildlife to be sustained in the canyon of which the Snake River flows.

Lastly, should there be the inevitable petition(s) for rehearing which quite often follow on the heels of our issued opinions,[14] the adverse parties involved, *i.e.*, South Fork Coalition v. Hays, would greatly oblige this one member of the Court if we were to be furnished with some explanation concerning the following question. Why in *South Fork I* did the Board make no appearance (seemingly proper because it, as the trier of fact, could not conceivably have had anything at stake), and yet in this case Hays has made no appearance, leaving it to the Board and its counsel to defend a Board decision of which Hays was the only beneficiary? Presumably Hays' very able counsel could have defended the Board decision. Hays' failure to do so has left the Board in the unenviable position of *advo-*

cating for a decision it *made* as a *quasi-judicial* body.

JOHNSON, Justice, dissenting.

I am unable to concur with part II of the majority opinion. This portion of the opinion concerns whether the ordinance in effect when the initial application was filed or the amended ordinance in effect when the application for approval of the final plans should apply to the proposal of Hays for a PUD. In my opinion, the amended ordinance is applicable.

---

**14.** In *State v. Stiffler,* S.Ct. No. 17846, both appellant and respondent favored us with almost

simultaneous petitions for rehearing, which were readily granted.